# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

SHANE ROBERT FERGUSON,
            *Defendant-Appellant.*

No. 07-50096

D.C. No.
CR-05-01154-JSL-
01

OPINION

Appeal from the United States District Court
for the Central District of California
J. Spencer Letts, District Judge, Presiding

Argued and Submitted
November 20, 2008—Pasadena, California

Filed March 27, 2009

Before: Susan P. Graber and Richard R. Clifton,
Circuit Judges, and David G. Trager,* District Judge.

Opinion by Judge Graber

---

*The Honorable David G. Trager, Senior United States District Judge
for the Eastern District of New York, sitting by designation.

## COUNSEL

Gary P. Burcham, Burcham & Zugman, A.P.C., San Diego, California, for the defendant-appellant.

Rupa S. Goswami, Assistant United States Attorney, Cyber and Intellectual Property Crimes Section, Los Angeles, California, for the plaintiff-appellee.

## OPINION

GRABER, Circuit Judge:

Defendant Shane Robert Ferguson videotaped himself sexually molesting his four-year-old neighbor. The government indicted Defendant on one count of possession of child pornography and one count of production of child pornography. Defendant pleaded not guilty and insisted on representing himself at trial and sentencing. Throughout the pre-trial proceedings, Defendant exhibited bizarre behavior that befuddled everyone involved, including the district court. The district court several times expressed its desire to deny Defendant's request to represent himself. But binding law at the time

required the district court to allow self-representation because Defendant was mentally competent to stand trial. Noting that its hands were tied, the district court acquiesced. Other than making a small number of nonsensical motions at sentencing, Defendant did nothing at trial or sentencing. A jury convicted Defendant, and the district court sentenced him to the statutory maximum of 480 months' imprisonment.

Today, we address the effect of the Supreme Court's intervening decision in *Indiana v. Edwards*, 128 S. Ct. 2379 (2008). In *Edwards*, the Court held that a different standard of mental competency applies when considering a defendant's request for self-representation than when considering whether a defendant may be tried at all. *Id.* at 2386. We remand to the district court to determine whether, in light of *Edwards*, it would have made a different mental competency decision. On all other issues, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

In 2005, the grandparents of a four-year-old girl became concerned that Defendant was sexually molesting their granddaughter. Defendant, who was in his early 30s, was a neighbor and close friend of the victim's family. Acting on credible information, the police executed a search warrant at Defendant's house.

The search uncovered numerous incriminating items of child pornography, including known images and videos of child pornography, as well as a home-made video of Defendant molesting the victim. Defendant confessed that he had filmed the assault using a hidden pin-hole camera in his bedroom, that he had lured the victim into participating by showing her images of child pornography, and that he had molested the victim. The government indicted Defendant on one count of production of child pornography, in violation of 18 U.S.C. § 2251(a), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).

As we detail below, Defendant's odd pre-trial conduct caused the district court much consternation. In a series of hearings and conferences, the court, Defendant's various lawyers, the government's lawyers, and Defendant himself engaged in lengthy discussions about self-representation and about Defendant's competency to stand trial.

The court originally appointed two defense lawyers to represent Defendant. At a pre-trial hearing, Defendant's lawyers requested a competency hearing because of their difficulties in communicating with Defendant. The court was initially skeptical and decided to question Defendant. Defendant addressed the court as follows, requesting six "duties," which would become a theme of Defendant's pre-trial conversations with the court:

I've requested these following six duties:

One, request that the judge issue me the appearance bond so that I may enter a plea; two, not to argue the facts; three, request the judge close all accounts; four, request the judge waive all public charges by the exemption in accordance to public policy; and, five, request the judge present me with the order of the court; and, six, request the judge release me.

When asked whether he wanted to plead guilty, Defendant responded, "Well, your honor, I fully accept the charges for value and for consideration. And I ask that these charges, these accounts be closed out and settled by the exemption in accordance to public policy." The court responded that it "ha[d] no idea what he's talking about." When Defendant explained his answers by reference to "House Joint Resolution 192, public law 73-10, and UCC 3-419," the court ordered a competency hearing. Defendant's reliance on the Uniform Commercial Code ("UCC") as a defense to his actions would also be a consistent theme of Defendant's.

Several weeks later, the district court conducted a competency hearing. The court-appointed psychologist had submitted a report on Defendant's mental competency to stand trial. The report concluded that Defendant "is presently mentally competent to stand trial," because he "is presently malingering mental illness and is consciously attempting to feign a disorder to delay or avoid prosecution." Neither party objected to the report's conclusions, and the district court ruled that Defendant was competent "to stand trial[ ] and . . . to assist counsel in the process of trial preparation and dealing with the trial matters."

Defendant again asked to address the court. He stated that he was "here by special appearance" (yet another theme) and that he wanted to "put these legal matters to peace . . . . [H]ow may I do that? How may we handle this in the private today?" After a discussion of why that was not possible, Defendant asked for "[o]ne last thing": "I'd like the record to reflect that I have presented [my lawyer] a notice of dishonor for not completing the six duties I have requested her to complete." The court told Defendant that it "[didn't] know where that stuff comes from," but that the only thing that the court could do is remove his current lawyers as counsel. Defendant did not so request, and the court adjourned the hearing.

One week later, the court conducted a change-of-plea hearing on the belief that Defendant wished to plead guilty. After a confusing exchange with the judge, Defendant stated: "I wish not to enter a plea at this time. I wish to be peace [sic], Your Honor." The court proceeded anyway but, when Defendant was given the chance to speak, he reiterated: "I do not wish to change my plea to a guilt guilty [sic] plea, Your Honor." The court tried again and, after a few responsive answers, Defendant responded: "I do not wish to testify at this time." The court then concluded that the case would go to trial and adjourned the hearing.

Eight days later, the court conducted a status conference to discuss a motion filed by Defendant's lawyers concerning

jurisdiction. As the parties discussed various matters, Defendant indicated a desire to speak and informed the court that he had fired his current lawyers. The court instructed Defendant at length that, although he did "have the option to represent [him]self" because the right to represent oneself is "an absolute legal right," the court strongly advised against it. The court then gave a lengthy warning about the dangers of self-representation. Defendant was unpersuaded and still sought to fire his lawyers and withdraw the pending motions that those lawyers had filed. The court ultimately acquiesced, and Defendant requested that "the court set off and adjust those [charges] by the exemption in accordance of this policy." The court responded that Defendant was speaking "gibberish [but] that doesn't make you incompetent."

After more confusing exchanges, the court noted that Defendant was now representing himself because "he's got an unrestricted right to do that." At one point, the court stated that it "would be desirable to have him declared incompetent, but that's not going to happen because he doesn't quali[f]y. So he's going to go to trial and then he's going to get the consequences of that, not all of which are socially good." The government's lawyer expressed concern about allowing Defendant to represent himself, and Defendant's recently fired lawyers stated that "it would be in [Defendant's] best interest to have new counsel appointed." After some discussion, the court decided to appoint new counsel.

A week later, the court conducted an in-chambers conference with the government's lawyer and Defendant's new lawyer. Defendant's new lawyer had encountered the same difficulties as had Defendant's previous lawyers in communicating with Defendant. The parties and the court discussed at length the problems with Defendant's actions. Both the judge and Defendant's lawyer stated numerous times that Defendant has an "absolute right" to represent himself. All parties, including Defendant, then met in open court. The court again instructed Defendant that "[y]ou start with an absolute right

to represent yourself." Defendant did not request self-representation at that time.

Two weeks later, the court conducted another in-chambers conference outside Defendant's presence. Defendant's lawyer said that Defendant wanted to represent himself. The court responded that "[t]he right to represent yourself and the right to be represented by counsel [are] clear. My own judgment is probably that the right to . . . represent yourself, if anything, trumps." The government's lawyer was again reluctant because allowing Defendant to represent himself was not in Defendant's best interest and might be reversible error.

All parties, including Defendant, then met in open court. The court began by reminding Defendant that his right to represent himself was "absolute." The court and Defendant then engaged in a long colloquy about various matters, during which it became clear that Defendant wished to rely on the UCC. The court eventually asked Defendant whether he wanted to represent himself. Defendant replied affirmatively. The government then suggested that perhaps the court should appoint a lawyer who is familiar with the UCC. Given the government's concerns that Defendant had not unequivocally expressed his desire to represent himself, the court asked again, and Defendant again responded affirmatively, that he wished to represent himself. After Defendant expressed his choice for self-representation a third time, unequivocally, the court accepted Defendant's choice. The court then appointed Defendant's most recent lawyer as advisory counsel.

At trial, Defendant did not make an opening statement; did not cross-examine any government witnesses; did not raise any objections; did not present witnesses; did not testify; and made no closing statement. He also did not object to any jurors. The jury convicted Defendant of both counts.

The presentence report ("PSR") recommended a total offense level of 49, corresponding to a Sentencing Guidelines

"range" of life imprisonment. Defendant submitted three non-sensical motions, which the district court denied. Otherwise, Defendant did not object to any aspect of the PSR, and the court adopted its calculations. The court sentenced Defendant to 480 months' imprisonment, the statutory maximum.

Defendant timely appeals and is represented by counsel on appeal.

## DISCUSSION

Defendant's primary argument on appeal is that the intervening Supreme Court decision, *Edwards*, 128 S. Ct. 2379, requires us to reverse his conviction or sentence. Because we reach that issue only if Defendant's other arguments for reversal fail, we address those other arguments first. We therefore consider (1) Defendant's constitutional challenges to the convictions, (2) his procedural and substantive challenges to the sentence and, finally, (3) his argument that *Edwards* requires reversal.

### A. *Constitutional Challenges to the Convictions*

[1] Defendant challenges his convictions on constitutional grounds. His arguments are identical to the defendant's arguments in *United States v. McCalla*, 545 F.3d 750 (9th Cir. 2008), *cert. denied*, 2009 WL 425144 (U.S. Feb. 23, 2009) (No. 08-829), which we rejected. *See id.* at 753-56 (rejecting the defendant's argument that "Congress lacks authority under the Commerce Clause to regulate the noncommercial and wholly intrastate production of child pornography, and therefore, as applied to him, 18 U.S.C. § 2251(a) is unconstitutional"); *id.* at 755-56 (holding that as-applied challenges relying on the "de minimis" character of the defendant's actions are foreclosed); *id.* at 756 (holding that *United States v. McCoy*, 323 F.3d 1114 (9th Cir. 2003), had been effectively overruled by *Gonzales v. Raich*, 545 U.S. 1 (2005)). Defendant's arguments are therefore foreclosed. Subject to our dis-

cussion below, in Part C, Defendant's convictions were not in error.

B.  *Challenges to the Sentence*

We review for abuse of discretion the district court's sentence. *United States v. Bendtzen*, 542 F.3d 722, 725 (9th Cir. 2008). "We will reverse the sentence only where it was procedurally erroneous or substantively unreasonable." *Id.* We review for plain error objections not raised to the district court. *United States v. Waknine*, 543 F.3d 546, 554 n.4 (9th Cir. 2008).

[2] On appeal, Defendant raises two procedural challenges to his sentence.[1] First, he argues that the district court did not adequately consider the factors in 18 U.S.C. § 3553(a). We disagree. The district court stated that it had considered the § 3553(a) factors, and Defendant did not provide any arguments requiring further explanation. The district court did not abuse its discretion. *See United States v. Stoterau*, 524 F.3d 988, 999 (9th Cir. 2008) ("[W]hen a defendant's arguments are straightforward and uncomplicated, the district court does not abuse its discretion when it listens to the defendant's arguments and then simply finds those circumstances insufficient to warrant a sentence lower than the Guidelines range." (brackets and internal quotation marks omitted)), *cert. denied*, 129 S. Ct. 957 (2009).

---

[1]Defendant also argues that his sentence was substantively unreasonable. We disagree. Despite equaling the statutory maximum, the district court's sentence of 480 months was below the Guidelines range of life imprisonment. Nothing in the record convinces us that Defendant's sentence was unreasonable. *See United States v. Carty*, 520 F.3d 984, 994 (9th Cir.) (en banc) (" '[W]hen the judge's discretionary decision accords with the [United States Sentencing] Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable.' " (quoting *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007))), *cert. denied*, 128 S. Ct. 2491 (2008).

Second, Defendant argues that the district court erred in calculating the Guidelines range. The PSR recommended a total offense level of 49, corresponding to a Guidelines "range" of life imprisonment. Defendant did not object to the PSR's recommendations at sentencing, and the district court adopted the PSR. Because the statutory maximum for Defendant's convictions is 480 months, the district court sentenced Defendant to that term of imprisonment. Defendant failed to object at sentencing, so we review for plain error. Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 732-34 (1993).

The district court did not fail completely to calculate the Guidelines range: The court stated that it calculated the total offense level as 49, corresponding to a range of 480 months.[2] Defendant's argument is that the district court did not actually engage in a calculation personally, but instead adopted the PSR's recommendation wholesale, without any analysis. Defendant stresses the following remark, made by the district court early in the sentencing hearing: "[A] number of [the PSR's recommendations were] . . . *probably in error*, but it turns out that even if you subtract those things it doesn't make any difference." (Emphasis added.) According to Defendant, even if a sentencing court must not explain each sentencing adjustment in the absence of an objection by the defendant, at the very least it must explain why it accepts sentencing adjustments that it believes are "probably in error." We do not quarrel with Defendant's premise, but we understand the district court's comment a bit differently.

**[3]** On appeal, Defendant argues that the Guidelines calculation was erroneous for four reasons. One of those reasons is that there were insufficient facts to establish a "pattern of activity involving prohibited sexual conduct." U.S.S.G.

---

[2]As noted, the range is actually "life," but the statutory maximum for Defendant's convictions dictated that the maximum was 480 months. Defendant does not argue that this shorthand was erroneous.

§ 4B1.5(b). We are not persuaded. The application notes to the Guideline provide that a pattern is established "if on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor." *Id.* cmt. n.4(B)(i). Applying that definition, the record here contains ample evidence of a pattern of prohibited sexual conduct with the victim.

**[4]** From that conclusion, it follows that, even if Defendant's other three challenges to the Guidelines calculation were sustained, the Guidelines range would still be "life." In other words, the probable errors noted by the district court could have had no effect whatsoever on the Guidelines range. We therefore understand the second clause of the district court's statement—"but it turns out that even if you subtract those things [probable errors] it doesn't make any difference" —in that light. We need not decide whether the district court's failure to address the unchallenged sentencing adjustments constitutes error, because our review is for plain error. Even if the district court erred, the error could not have changed the Guidelines range and, therefore, the alleged error did not "affect[ ] the outcome of the district court proceedings." *Olano*, 507 U.S. at 734; *see also Waknine*, 543 F.3d at 553 (holding that a procedural error did not affect the defendant's substantial rights because the defendant did not convince us that the correct procedure "would have changed the district court's conclusion as to the appropriate prison term").

**[5]** In conclusion, we hold that, subject to our discussion below, in Part C, the district court's sentence was not in error.

## C.   *Mental Competence and Self-Representation*

We turn now to the dominant issue in this case, which stands at the intersection of two well-known and important constitutional principles: a criminal defendant's right to self-representation, *see generally Faretta v. California*, 422 U.S. 806 (1975); and the prohibition against trying a criminal defendant who lacks "mental competency," *see generally*

*Dusky v. United States*, 362 U.S. 402 (1960) (per curiam). The former principle holds that a defendant who knowingly, voluntarily, and intelligently waives the right to counsel generally must be permitted to represent himself or herself at trial. *Faretta*, 422 U.S. at 835. And the latter principle holds that a defendant lacks mental "competency" to stand trial unless he or she has "a rational as well as factual understanding of the proceedings" and "has sufficient present ability to consult with his [or her] lawyer with a reasonable degree of rational understanding." *Dusky*, 362 U.S. at 402 (internal quotation marks omitted). Those principles intersect where, as here, a defendant meets the *Dusky* standard for mental competence (despite irrational and nonsensical behavior) and, additionally, insists on representing himself during trial and sentencing. Must the trial court permit Defendant to represent himself?

Until recently, the Supreme Court's guidance had indicated that the answer was "yes." *See Godinez v. Moran*, 509 U.S. 389, 398 (1993) ("[W]e reject the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* standard."); *see also id.* at 404 (Kennedy, J., concurring in part and concurring in the judgment) ("The Due Process Clause does not mandate different standards of competency at various stages of or for different decisions made during the criminal proceedings."). And, like most of our sister circuits, we had so held. *See United States v. Hernandez*, 203 F.3d 614, 620-21 (9th Cir. 2000) ("Where a defendant's waiver of his Sixth Amendment right to counsel meets [the *Faretta*] requirements, a court must permit the defendant to proceed pro se."); *id.* at 620 n.8 ("[A] defendant's competence to waive the right to counsel is measured by the same standard under which competence to stand trial is evaluated."). Quite understandably, then, the district court and the parties repeatedly referred to Defendant's "absolute right" to represent himself. And, in response to Defendant's

valid waiver of his right to counsel, the district court granted Defendant's request.

While this case was pending on appeal, however, the Supreme Court decided *Edwards*, 128 S. Ct. 2379. There, the Court addressed whether the general *Dusky* mental competence standard—as described in *Godinez*—applies to the question of mental competence for self-representation at trial. *Edwards*, 128 S. Ct. at 2383. The Court "concede[d] that *Godinez* bears certain similarities with the present case," but nevertheless held that *Godinez* did not control. *Id.* at 2385. "In *Godinez*, the higher standard sought to measure the defendant's ability to proceed on his own *to enter a guilty plea*; here the higher standard seeks to measure the defendant's ability *to conduct trial proceedings*." *Id.* (emphases added).

**[6]** The Court then turned to the "open" question of the proper standard to measure a defendant's competence to conduct trial proceedings. *Id.* It held that the question of mental competence for self-representation "calls for a different standard" than the question of mental competence for assistance of counsel at trial. *Id.* at 2386. The Court therefore recognized "a mental-illness-related limitation on the scope of the self-representation right." *Id.* at 2384. The Court explained that

> the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky*, but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.

*Id.* at 2387-88.[3] The Court declined to adopt a "specific stan-

---

[3]Both *Edwards* and *Godinez* involved the parameters of the right to self-representation in *state* trial courts. Although this case arises in the context of a *federal* trial court, we see no relevant constitutional difference here.

dard," *id.* at 2388, leaving it instead to the discretion of the "trial judge, . . . who . . . will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant," *id.* at 2387.

The Court's answer was driven by "[s]everal considerations." *Id.* at 2386. First, the Court found that its precedents "slightly" favored a different standard. *Id.* Second, the Court recognized that "[m]ental illness itself is not a unitary concept. . . . In certain instances an individual . . . will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel." *Id.* Third, "insofar as a defendant's lack of capacity threatens an improper conviction or sentence, self-representation in that exceptional context undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial." *Id.* at 2387. "Further, proceedings must not only be fair, they must 'appear fair to all who observe them.' " *Id.* (quoting *Wheat v. United States*, 486 U.S. 153, 160 (1988)).

**[7]** In the light of the Supreme Court's latest decision, we can see that the district court (understandably) applied an erroneous legal standard. The district court followed, naturally enough, existing Supreme Court and Ninth Circuit law, repeatedly referring to Defendant's "absolute right" to represent himself once the court found him competent to stand trial. *Edwards* changed that proposition. The standard for a defendant's mental competence to stand trial is now different from the standard for a defendant's mental competence to represent himself or herself at trial.[4] *Id.* at 2384-86.

---

[4]We therefore recognize as overruled our earlier decisions—such as *United States v. Hernandez*, 203 F.3d 614 (9th Cir. 2000)—that are "clearly irreconcilable" with *Edwards*. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc); *see Hernandez*, 203 F.3d at 620 n.8 ("[A] defendant's competence to waive the right to counsel is measured by the same standard under which competence to stand trial is evaluated.").

The question, then, is whether *Edwards* applies here factually, that is, whether Defendant was mentally competent to conduct his own defense under the *Edwards* standard. There are many indications in the record that *Edwards* does not apply. In pre-trial conferences, the district judge observed that Defendant likely was either malingering or intentionally obstructing the proceedings to inject error. The psychiatrist's report stated that Defendant was malingering, and there are no contrary psychiatric reports. Whereas the Supreme Court in *Edwards* was assessing a defendant with a "severe mental illness," 128 S. Ct. at 2388, no similar psychiatric report is present here.

**[8]** But there are also many indications in the record that *Edwards* might apply. For example, we note that the psychiatric reports are of limited value, because they considered Defendant's mental competency under the pre-*Edwards* standard. The psychiatric reports considered whether Defendant was mentally competent to work with counsel at trial—the correct pre-*Edwards* inquiry. But the Supreme Court made clear that a different inquiry now applies: whether Defendant is able "to carry out the basic tasks needed to present his own defense without the help of counsel." *Id.* at 2386. Next, we note that Defendant's behavior was decidedly bizarre, as even a cursory review of the transcripts reveals. He repeatedly demanded that his counsel follow his six made-up "duties" and fired his lawyers when they were unable to meet those "duties." He repeatedly insisted that he was making only a "special appearance," asked to settle the case "in the private," requested the judge to recognize the "public policy" exception in the UCC and dismiss the case "for value," and attempted to file a motion of "dishonor" against his lawyers. Finally, Defendant's behavior at trial and sentencing gives us pause, as it did the district court. At trial, Defendant did absolutely nothing—no voir dire questions for the judge to ask, no opening argument, no closing argument, no objections, no cross-examination, no evidence, and no witnesses. At sentencing, he

submitted three nonsensical motions, did not object to the PSR, and did not make any legal arguments.

Defendant's behavior at trial could be interpreted as a desperate (but competent) move in the hope that the government would misstep, or that the jury would have sympathy, or for some other strategic reason. But, once the jury convicted him, there was far less reason for continuing his odd behavior at sentencing. Yet Defendant continued his bizarre and wholly ineffective behavior. Faced with the near-certain likelihood of the statutory maximum sentence, Defendant had almost nothing to gain and everything to lose by continuing with his "six duties" demands, UCC defense, and refusal to mount any legal challenges to the sentence.

The Supreme Court's reasons in *Edwards* also point to the possibility that *Edwards* applies here. Defendant's actions suggest that he might have been "unable to carry out the basic tasks needed to present his own defense without the help of counsel." *Id.* at 2386. Furthermore, Defendant's complete failure to defend himself seriously jeopardized the fairness of the trial and sentencing hearing and, at the very least, seriously jeopardized the *appearance* of fairness. *Id.* at 2387. Perhaps most importantly, the record suggests that the district court might have forced counsel upon Defendant, had the court had the benefit of reading *Edwards*. Even the government's lawyer was extremely keen to have Defendant represented, because he was concerned that self-representation in this case would be error. Reviewing the record, there was a lot of hand-wringing by the court—both when Defendant was present and when he was not—that Defendant's self-representation would seriously jeopardize the fairness of the trial. For instance, the court stated at one point before trial that it "would be desirable to have him declared incompetent" and, at another point, also before trial, "I think that it is terrible to let him represent himself." At the sentencing hearing, the court said that it had "never heard of an example of some-

body that behaved at trial the way [Defendant] had," in 20 years on the federal bench.

Ultimately, however, we cannot accurately determine from the record whether the district court would have operated differently with the benefit of *Edwards*. Fortunately, we need not divine the district court's hypothetical conclusions.

We have dealt previously with a situation similar to this one: where an intervening Supreme Court decision granted theretofore-lacking discretion on the district court. Before the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing Guidelines were mandatory. When the Court held that the Guidelines were not mandatory, it threw into uncertainty hundreds of cases still on appeal,[5] in which the district court had sentenced the defendant under the mandatory Guidelines. The question in those cases was whether the district court would have imposed a different sentence had it known that the Guidelines were advisory only.

In *United States v. Ameline*, 409 F.3d 1073, 1079 (9th Cir. 2005) (en banc), we held that "the best way to deal with this unusual situation is to . . . ask the person who knows the answer, the sentencing judge." (Footnote omitted.) We reasoned that "[t]his is '[t]he only practical way (and it happens also to be the shortest, the easiest, the quickest, and the surest way) to determine' " the answer. *Id.* (second alteration in original) (quoting *United States v. Paladino*, 401 F.3d 471, 483 (7th Cir. 2005)). We therefore detailed a "limited remand" process. *Id.* at 1084-85. Briefly, if the district court held that it would have imposed the same sentence, then the sentence would be re-entered. *Id.* at 1085. If not, however, then the district court would conduct a new sentencing proceeding. *Id.*

---

[5]Unlike the effect of the Court's decision in *Booker*, we anticipate that *Edwards* and our decision today will affect very few, if any, pending cases. As our discussion makes clear, Defendant's actions and the procedural history of this case are very unusual.

**[9]** Here, we follow an analogous pattern and remand to the district court for the limited purpose of determining whether *Edwards* would have affected the district court's decisions.[6] *Cf. United States v. Arenburg*, No. 08-CR-090A, 2008 WL 3286444, *5 (W.D.N.Y. Aug. 7, 2008) (considering a post-trial motion to vacate the jury's verdict and asking "whether a new trial is required in light of the Supreme Court's holding in *Edwards*"); *id.* ("Clearly, as a result of *Edwards*, this [c]ourt had the authority to . . . revoke the defendant's *pro se* status if the [c]ourt believed that the defendant's mental illness was so severe that he was not competent to continue representing himself at trial."). Our decision is guided both by *Ameline* and by the Supreme Court's recognition that "the trial judge, particularly one such as the trial judge in this case, who presided over [Defendant's] competency hearing[ ] and his . . . trial[ ], will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Edwards*, 128 S. Ct. at 2387.

On remand, the district court may—but is not required to—take additional evidence or allow briefing on Defendant's state of mind at the relevant time. If the district court concludes that it would not have altered its decisions at either trial or sentencing even with the benefit of *Edwards*, then the conviction and sentence will stand. If the court rules that it would have altered its decision at trial, then the court should

---

[6]In *United States v. DeShazer*, 554 F.3d 1281, 1290 (10th Cir. 2009), the Tenth Circuit held—as we hold today—that *Edwards* does not *compel* a trial court to deny a defendant the exercise of his or her right to self-representation; it simply *permits* a trial court to require representation for a defendant who lacks mental competency to conduct trial proceedings. The court in *DeShazer* affirmed the defendant's conviction, apparently on the belief that *Edwards* would have had no effect on the district court's decision. *Id.* Here, because the record contains many statements suggesting that the district court might have ruled differently under an *Edwards* standard, we remand for the limited purpose of permitting the district court to make that discretionary decision.

vacate the conviction and sentence and conduct a new trial, with Defendant represented by counsel. If the court rules that it would have altered its decision at sentencing only, then the conviction will stand, but the court should vacate the sentence and conduct a new sentencing proceeding, with Defendant represented by counsel.

REMANDED with instructions to consider the effect of the intervening Supreme Court decision in *Edwards*; otherwise AFFIRMED.