STATE of Iowa, Plaintiff–Appellee,

v.

Daniel Samuel JASON, Defendant–Appellant.

No. 08–1042.

Court of Appeals of Iowa.

Dec. 17, 2009.

Mark C. Smith, State Appellate Defender, Shellie L. Knipfer, Assistant Appellate Defender, and Christopher R. Kemp, Student Legal Intern, for appellant.

Thomas J. Miller, Attorney General, Mary E. Tabor, Assistant Attorney General, Janet M. Lyness, County Attorney, and Deborah Farmer Minot, Assistant County Attorney, for appellee.

Heard by SACKETT, C.J., and VAITHESWARAN and DANILSON, JJ.

DANILSON, J.

Daniel Jason appeals the judgment and sentence entered upon his convictions of stalking in violation of a no-contact order and tampering with a witness. We affirm in part, vacate in part, and remand for

further proceedings in accordance with this opinion.

## I. Background Facts & Proceedings.

Daniel Jason and Cynthia Courter had an intimate relationship while students at the University of Iowa in 2005. They continued dating that spring, spent the summer in their respective home towns (Courter in Chariton, Iowa, and Jason in Buffalo Grove, Illinois), and then resumed their relationship in the fall of 2005, but with more "ups and downs." Jason, who was a year ahead of Courter at the university, graduated a semester early in December of 2005.

In late December or early January of 2006, Courter decided to end the relationship. In January and February 2006, Jason's sadness over the break-up turned to anger toward Courter. He would contact Courter by e-mail, telephone, and text-message hundreds of times a day. She told him repeatedly that she did not want to have contact with him, to no avail.

In February 2006, Courter had received various e-mails and text-messages from Jason saying that he was planning to commit suicide if she did not contact him. Courter then received a telephone message from Jason's father in Illinois, informing her that Jason was missing, that he had taken his father's car, and might be heading to Iowa to see her. Soon after she got this message, there was a knock on her dormitory door and Jason demanded that she let him in. Courter called her parents at home in Chariton; her mother, Nancy Courter, could hear the pounding on the door over the telephone. Meanwhile, Courier's father, Gary Courter, called campus security officers, who detained Jason and transported him for psychiatric evaluation. After he was released from custody, he went directly back to Courier's dorm room, but she had left campus for the night.

Jason continued to barrage Courter with unwelcome communications (which alternated between begging to reconcile and threatening to reveal her personal secrets) through the spring of 2006. Courter changed her phone number due to the volume of calls she received from him.

During the summer of 2006, Jason continued to e-mail Courter, who was staying with a friend in Ames. On occasion she would respond, trying to convince him she did not want to have further contact with him. Courter's parents tried to help her obtain a court order prohibiting Jason from contacting her. This effort was unsuccessful as the judge apparently concluded there was a lack of evidence of an assault. Law enforcement officials advised Courter to cut off all contact with Jason, which she did.

Just before the fall semester in August 2006, Courter learned that Jason had been admitted to the graduate school of business at the University of Iowa and would be returning to Iowa City. Within the first few weeks of being back in Iowa City, Jason twice initiated in-person contact with Courter, once at a bus stop and once at the student union.

On September 14, 2006, Courter was leaving a class and encountered Jason, who brought out two sandwiches and insisted that they eat dinner together. After first telling him "no," Courter finally gave in "under the condition that he leave me alone for good after we had dinner." However, after eating together on the riverbank Courter tried to leave, but Jason grabbed her arm and started dragging her away. Courter was able to place a cell phone call to her mother in Chariton, who in turn contacted the Iowa City police.

The police arrested Jason and charged him with assaulting Courter. On November 4, 2006, the court issued a protective order in conjunction with the criminal charge. Despite Courter's "high hopes" that Jason would obey the court order, he contacted her the very day he was released from jail.

The business college expelled Jason due to his criminal conduct, prompting him to send angry e-mails to Courter blaming her for "ruining his life." In October 2006, Jason used the alternative identities of "Brandon Dekalmes" and "Alex Rotchshield" to send e-mails to Courter in the third person, urging her to get back together with him. Jason also appeared in October at a bus stop while Courter was waiting for the bus. When she tried to ignore him, he started walking up and down the busy sidewalk loudly chanting offensive remarks. Embarrassed and frightened, Courter walked away.

Based on the September 2006 incident on the riverbank, the e-mails under assumed names, and the October 2006 bus stop encounter, Jason was charged with four misdemeanors—one count of assault and three counts of harassment. Those charges were set for trial February 7, 2007.

During the fall of 2006, Jason also launched a website dubbed FreeDanners.com. "Danners" was a pet name that Courter had used for Jason during their relationship. Jason posted personal information about Courter on the website, "to let the world know" how she had wronged him.

During November and December 2006, Jason sent several letters (one included a check) and an unsolicited pizza to Courter, communications that she reported to the Iowa City police. The police applied for a warrant to arrest Jason for violating the no-contact order.

In mid–December, Jason began sending e-mails to Courier's father, Gary, at the Chariton High School where he had been a teacher for thirty-four years. The e-mails contained detailed information about Jason's breakup with Courter, blamed the Courter family for Jason's troubles, and stated that they needed to stop the proceedings against him or he would go public with the personal information. Jason also called the Courter home in Chariton forty to fifty times on the morning of December 16, 2006. The Lucas County Sheriff set up a "trap and trace" on the Couriers' phone line and confirmed that Jason placed another eighty calls to their residence within the next two days.

On February 7, 2007, Jason was convicted of the simple misdemeanor assault and the three counts of harassment. Jason stipulated to violating a no-contact order. On February 16, 2007, he was sentenced to 120 days in jail—all suspended—with the no-contact order being extended for five years. Jason stated at the sentencing hearing that he would never contact Courter again. However, he was released from jail just after noon on February 27 and sent an e-mail to Courter at 2:26 p.m. Jason sent more than 100 e-mail messages to Courter in late February and March 2007.

On March 10, 2007, Courter went out with friends in downtown Iowa City to celebrate her birthday. Jason showed up at the bar uninvited, approached Courter's table, and reached across as if to grab her. Courter pulled out her cell phone and called the Iowa City police, a number she had programmed into her speed dial. Police could not locate Jason that night, but applied for an arrest warrant for the no-contact order violation.

On March 19, 2007, Jason started sending e-mails to the law student who served

as a prosecuting intern at Jason's simple misdemeanor trial. The messages indicated that Jason did not feel compelled to comply with the no-contact order issued by the magistrate court because "it's a free country" and "no judge will tell me what I can do, I can do what I want." He also admitted seeing Courter on her birthday and dared the prosecuting intern to file stalking charges.

From mid to late March, Courter received e-mails from Jason that indicated he was in Florida. Some of them featured photograph attachments, including nude photographs where Jason's body appeared to be smeared with feces and another where he had an erect penis. In others, Jason took on "the persona of a little boy" and talked about wearing diapers. In still others, Jason threatened to beat Courter "black and blue" and to "hunt [her] like prey."

When Courter reported the e-mails to Iowa City police, Officer Gabriel Cook asked her to correspond with Jason under police supervision in an effort to bring him back to Iowa City for arrest. Courter initiated contact with Jason several times between March 21 and March 27, 2007. Courter was home in Chariton on March 30, 2007, when she learned that Jason was staying at the Super 8 motel about a mile from her parents' house. The Lucas County Sheriff arrested Jason at the motel.

A trial information was filed on April 9, 2007, alleging that Jason committed stalking while restricted by a court order, a class "D" felony, in violation of Iowa Code sections 708.11(2) and 708.11(3)(b) (2007), and tampering with a witness, an aggravated misdemeanor, in violation of section 720.4. Jason filed a written arraignment and plea of not guilty on April 19, 2007. On May 4, 2007, Jason's first attorney, Dai Gwilliam, was permitted to withdraw, and

public defender Tom Woods was appointed to represent Jason.

On June 6, 2007, Tom Woods filed an "Application for Finding of Competency." Woods contended his client was "suffering from a mental disorder which prevents him from appreciating the charge, understanding the proceedings, or assisting effectively in the defense." Woods attached a report from psychologist Dan Rogers who attempted to assess Jason, but was not able to complete a full evaluation because of Jason's "abnormal thought processes." The State did not resist a further evaluation of Jason at the Iowa Medical and Classification Center (IMCC). On June 7, 2007, the district court suspended the criminal proceedings and ordered a competency evaluation.

On June 11, 2007, Joseph and Nancy Jason, the defendant's parents, wrote to the court expressing concern for their son's "deteriorating mental health." They visited Jason in jail on May 29, 2007, and found it very difficult to communicate with him.

Jason filed pro se letters with the court starting in May and continuing throughout the summer and fall of 2007.

On August 22, 2007, attorney E. Daniel O'Brien made an appearance on Jason's behalf. On September 7, 2007, O'Brien filed an application for psychiatric evaluation at State expense, noting a delay at IMCC in completing evaluations. The State did not resist the request, and the court granted the application on September 13, 2007.

On October 2, 2007, psychologist Frank Gersh evaluated Jason. Dr. Gersh wrote to O'Brien, concluding that he could find no evidence of psychosis as suggested in the letter from Jason's parents. Dr. Gersh did find that Jason met the diagnostic criteria for Asperger's Syndrome,

which is marked by the following symptoms:

difficulty in interpreting social situations, especially non-verbal social communication, and difficulty with eye contact and nonverbal communication to others; failure to develop peer relationships; lack of social or emotional reciprocity; preoccupation with one or more stereotyped patterns of interest that is abnormal in intensity; and clinically significant impairment in social and occupational functioning.

Dr. Gersh noted that Jason's mood was appropriate and he denied being depressed. Jason's appetite, sleep patterns, energy level, memory, and concentration were all normal. Jason told Dr. Gersh that he did not cooperate with Dr. Rogers because he was angry with his former attorney for arranging a competency evaluation. Dr. Gersh's interview and testing revealed that Jason was competent to stand trial. Jason understood the role of all the parties in the prosecution and was "involved in planning trial strategy" with his attorney.

The district court held a competency hearing on November 27, 2007, at which Dr. Gersh and Jason testified. Dr. Gersh opined that Jason was competent to stand trial. Dr. Gersh stated that the diagnosis of Asperger's Syndrome does not include delusions or hallucinations. Although Asperger's Syndrome affects a person's ability to interact socially, Dr. Gersh explained that it does not affect cognitive understanding. He noted that many people with Asperger's hold jobs.

Jason testified to his detailed understanding of the charges against him, the upcoming trial process, the roles of all the parties, and the expected conduct of the participants. His testimony demonstrated a comprehension of the process. Jason also understood that he could represent himself if approved "through a hearing before the court," but he expressed a desire to have an attorney for trial.

The district court found Dr. Gersh's testimony credible and concluded that Jason was competent to stand trial.

On December 10, 2007, O'Brien notified the district court that his client expressed a desire to represent himself. The district court engaged Jason in an extensive colloquy concerning his lack of legal training, the knowledge of criminal procedure necessary for trial practice, and the "high stakes" involved in the felony stalking trial. The district court "strongly advised" against self-representation but Jason persisted. The district court appointed O'Brien standby counsel and noted:

And if at some point in the trial, Mr. Jason, I find that you just can't do this, Mr. O'Brien may be called in to finish the case. You have a right to representation but to self-destruct, I'm not sure about. It's your voluntary decision, but I've expressed my concerns about that.

Acting pro se, Jason argued his motions in limine, conducted voir dire, delivered an opening statement, made objections, cross-examined the State's witnesses, and performed a direct examination of himself. The district court allowed standby counsel to perform the direct examinations of Jason's parents. Jason gave his own closing argument. The jury returned guilty verdicts on both counts.

Prior to sentencing, Jason made application for another psychiatric evaluation. The application was granted, and Jason was evaluated by Loren A. Olsen, M.D., a board certified psychiatrist. This evaluation confirmed the diagnosis that Jason suffered from Asperger's syndrome. Dr. Olsen also opined that Jason's brain disorder causes an "inability to estimate cogni-

tive, perceptual, and affective responses in the lives of others as well as self."

Jason also requested a new attorney prior to sentencing. Victoria Cole was appointed to represent Jason on March 6, 2008. On April 3, 2008, Jason filed a pro se request for a new attorney, stating: "My attny is Hispanic and a liar." On April 4, 2008, Cole moved to withdraw. At an April 9, 2008 hearing on the matter, Jason asked the court to deny Cole's motion to withdraw. The court granted Cole's motion to withdraw and appointed attorney Eric Tindal to represent Jason.

On May 19, 2008, Tindal filed a motion for new trial, alleging—among other things—that the court erred relative to his waiver of counsel and in denying Jason's request for "hybrid" counsel. The district court overruled the new trial motion in its entirety.

On May 29, 2008, the district court sentenced Jason to an indeterminate term of five years on the stalking conviction and an indeterminate term of two years on the tampering conviction, the sentences to be served consecutively. Jason was to receive 426 days credit for time served on the sentences. During a limited remand, the sentencing court issued an order clarifying that the credit was to be accorded once on the consecutive sentences and not twice that amount.

Jason appeals. He asserts the trial court erred in not considering his mental impairment in determining whether to allow his request for self-representation. He also contends the trial court erred in failing to state the reasons for imposing consecutive sentences.

## II. Scope and Standards of Review.

██ Our review of constitutional claims is de novo. *State v. Tejeda,* 677 N.W.2d 744, 749 (Iowa 2004). We review

criminal sentences and compliance with Iowa Rule of Criminal Procedure 2.23(3)(d) for correction of errors at law. Iowa R.App. P. 6.4; *State v. Thomas,* 547 N.W.2d 223, 225 (Iowa 1996).

## III. Discussion.

A. **Self-representation and *Indiana v. Edwards.*** The parties first dispute whether error was preserved. Jason moved for new trial relative to his waiver of counsel and the court's alleged error in refusing to consider Jason's disabilities for a "hybrid" form of representation. We find the trial court was adequately alerted to consider Jason's competency to proceed to trial pro se.

██ A defendant has a Sixth and Fourteenth Amendment right to self-representation under the United States Constitution. *Faretta v. California,* 422 U.S. 806, 807, 95 S.Ct. 2525, 2527, 45 L.Ed.2d 562, 566 (1975); *see also State v. Cooley,* 608 N.W.2d 9, 14 (Iowa 2000).

> When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent oneself, an accused must knowingly and intelligently forgo those relinquished benefits.

*Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 581; *Cooley,* 608 N.W.2d at 14.

> Thus a serious and weighty duty has been imposed upon trial courts to determine whether a waiver is competent and intelligent.... To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right

to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered.

*Cooley,* 608 N.W.2d at 15 (internal quotations and citations omitted).

Here, Jason does not contend he was not competent to stand trial. Rather, he asserts the trial court had a duty, sua sponte, to consider his mental competency to represent himself at trial even though he had been found competent to stand trial. He relies upon the United States Supreme Court decision in *Indiana v. Edwards,* 554 U.S. ——, ——, 128 S.Ct. 2379, 2388, 171 L.Ed.2d 345, 357 (2008), in which the court held:

> The Constitution does permit States to insist upon representation by counsel for those competent enough to stand trial ... but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.

■ We note that Jason asked to represent himself on December 10, 2007, some months before the United States Supreme Court issued its *Edwards* decision. Thus, the district court was without the benefit of the *Edwards* decision.[1] The State argues that *Edwards* should not be applied retroactively. However, there is no reason not to apply *Edwards* under the criteria noted in *Everett v. Brewer,* 215 N.W.2d 244, 247 (Iowa 1974) (stating that retroactivity is a "function of three considerations[:] (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards"). Retroactive application here assures the defendant of a fair trial; can easily be administered by remand to the trial court; and law enforcement has not relied upon the old standard. *Id.*

Under *Edwards,* state trial courts are permitted "to limit [a] defendant's self-representation right by insisting upon representation by counsel at trial—on the ground that the defendant lacks the mental capacity to conduct his trial defense unless represented." *Edwards,* 554 U.S. at ——, 128 S.Ct. at 2386–87, 171 L.Ed.2d at 355; *see, e.g., United States v. De-Shazer,* 554 F.3d 1281, 1290 (10th Cir.2009) ("[W]hile the district court was not compelled to find Mr. DeShazer competent to waive his right to counsel simply because the court had found him competent to stand trial, it does not follow that the district court was absolutely prohibited

---

1. At the time, the trial court's guidance came from *Godinez v. Moran,* 509 U.S. 389, 398, 113 S.Ct. 2680, 2686, 125 L.Ed.2d 321, 331 (1993), in which the United States Supreme Court "reject[ed] the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* standard." In *Dusky v. U.S.,* 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824, 825 (1960), the court stated that "the test must be ... whether he has a rational as well as factual understanding of the proceedings against him." (Citation omitted.) *Edwards* did not overrule *Godinez. Edwards,* 554 U.S. at ——, 128 S.Ct. at 2385, 171 L.Ed.2d at 354 (noting, rather, that *Godinez* "does not answer the question before us now").

from doing so. To the contrary, *Edwards* itself reaffirmed that a court may constitutionally permit a defendant to represent himself so long as he is competent to stand trial."); *State v. McNeil,* 405 N.J.Super. 39, 963 A.2d 358, 365 (2009) ("*Edwards* does not prevent a State from permitting a defendant with a mental illness from representing himself if competent to stand trial; rather, it held that the Sixth and Fourteenth Amendments do not require it."). The *Edwards* court noted that the trial judge is "best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Edwards,* 554 U.S. at ——, 128 S.Ct. at 2387, 171 L.Ed.2d at 357.

■ Jason argues that "the trial court never considered [his] lack of mental capacity in determining whether to grant his request to proceed pro se." The trial court thoroughly advised Jason of the risks and dangers of self representation, but only tangentially touched upon his mental state.

The district court stated,

And if at some point in the trial, Mr. Jason, I find that you just can't do this, Mr. O'Brien may be called in to finish the case. You have a right to representation but to self-destruct, I'm not sure about. It's your voluntary decision, but I've expressed my concerns about that.

The trial court did not consider that there might be a limit to Jason's right to self-representation, but determined Jason's decision was "made voluntarily, understanding the consequences, ... which most surely are serious ones." The court allowed Jason to represent himself and ordered standby counsel.

This case is the obverse of *Edwards.* The trial judge did not require Jason to be represented by counsel; rather she permitted Jason to represent himself. Notwithstanding, other courts have concluded:

[W]hen a trial court is presented with a mentally ill or mentally incapacitated defendant who, having been found competent to stand trial, elects to represent himself, the trial court also must ascertain whether the defendant is, in fact, competent to conduct the trial proceedings without the assistance of counsel. *State v. Connor,* 292 Conn. 483, 973 A.2d 627, 655 (2009); *see United States v. Ferguson,* 560 F.3d 1060, 1068 (9th Cir.2009) ("The standard for defendant's mental competence to stand trial is now different from the standard for a defendant's mental competence to represent himself or herself at trial.").

In reaching these conclusions, other courts have remanded the proceedings to the trial court to conduct a hearing to determine the defendant's competency to represent himself or herself post-trial. *See Ferguson,* 560 F.3d at 1070; *Connor,* 973 A.2d at 658–59; *State v. Lane,* 362 N.C. 667, 669 S.E.2d 321, 322 (2008); *cf. State v. Klessig,* 211 Wis.2d 194, 564 N.W.2d 716, 724–25 (1997) (pre–*Edwards,* but remanding for hearing on defendant's competence to proceed pro se).

These courts rely ostensibly upon this passage in *Edwards:*

We consequently conclude that the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.

*Edwards,* 554 U.S. at ——, 128 S.Ct. at 2387–88, 171 L Ed.2d at 357. The premise underlying the passage is the fairness of the trial. *Id.* at ——, 128 S.Ct. at 2387, 171 L.Ed.2d at 357 (citing *Massey v. Moore,* 348 U.S. 105, 108, 75 S.Ct. 145, 147, 99 L.Ed. 135, 138 (1954) ("No trial can be fair that leaves the defense to a man who is insane, unaided by counsel, and who by reason of his mental condition stands helpless and alone before the court.")); *Connor,* 973 A.2d at 655 ("[W]hen a mentally ill or incapacitated defendant is permitted to represent himself at trial despite his lack of competence to do so, the reliability of the adversarial process, and thus the fairness of the trial itself, inevitably is cast in doubt.").

We note too that the *Edwards* decision restricts the right to limit a defendant's right to self-representation to defendants "who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Edwards,* 554 U.S. at ——, 128 S.Ct. at 2388, 171 L.Ed.2d at 357. The *Edwards* court recognized that mental illness is not a singular category. "Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways." *Id.* at ——, 128 S.Ct. at 2386, 171 L.Ed.2d at 356.

The parties agree that Jason was diagnosed with Asperger's Syndrome as a teen and that Asperger's Syndrome is a recognized developmental disorder. This record is unclear whether Asperger's Syndrome is a "severe mental illness," which necessarily hampers a defendant's self-representation right, as that term is used by the *Edwards* court.

Dr. Gersh opined at the competency hearing that Jason's diagnosis of Asperger's Syndrome would not affect his ability to understand the charges against him or participate in his own defense. He explained that Asperger's "affects a person's ability to socialize and understand . . . nonverbal communication, cues and to interact with people in a reasonable way, in social situations," but would not affect the defendant's "cognitive understanding of what is going on."

Jason was not hindered academically by his Asperger's. He graduated from college in three and one-half years with an A-minus grade point average. Jason was accepted into the graduate college of business in accounting at the University of Iowa. He apparently successfully traded stocks on-line.

During the *Faretta* colloquy with the district court, Jason told the court that he was not pursuing a diminished responsibility defense at trial. He also told the court that his experience with mock trial in high school and college would help prepare him to represent himself despite his lack of legal training.

We acknowledge that the *Edwards* decision addressed a defendant with a history of extremely debilitating psychiatric diagnoses charged with capital offenses. However, a close examination of this case reflects that psychological evaluations were completed pending trial, but the only psychiatric evaluation was completed just prior to sentencing. Dr. Loren Olsen's psychiatric evaluation of Jason revealed concerns about Jason's lack of "cognitive, perceptual, and affective responses." Jason argues on appeal that his responses and actions throughout the trial constituted a manifestation of the symptoms of Asperger's syndrome. We share this concern.

We find that Jason may be a "gray-area" defendant who was competent to stand trial, but not competent to take on

the expanded role of representing himself at trial. *See id.* at ——, 128 S.Ct. at 2385, 171 L Ed.2d at 355. We remand to the trial court for a hearing to determine whether it would have denied Jason's right to represent himself at trial in light of the standards established in *Edwards*[2] and subsequent cases that have recognized a constitutional violation when a defendant who is not competent to present his own defense without the help of counsel is allowed to do so. If the court would have denied Jason's request to represent himself at trial, the trial court shall grant Jason a new trial; if not, the convictions are affirmed.

***B. Consecutive Sentences.*** We address Jason's second claim of error because the trial court may determine that a new trial is not warranted.

■ The sentencing court must state on the record its reasons for imposing consecutive sentences. Iowa R.Crim. P. 2.23(3)(d) (formerly numbered 22(3)(*d* )); *State v. Johnson,* 445 N.W.2d 337, 342 (Iowa 1989). A defendant is not required to preserve error on a claim that the trial court failed to articulate adequate reasons for the sentence. *State v. Boltz,* 542 N.W.2d 9, 10 (Iowa Ct.App.1995). Reviewing courts will "look to all parts of the record to find the supporting reasons." *State v. Delaney,* 526 N.W.2d 170, 178 (Iowa Ct.App.1994).

When it is apparent on review that the district court ordered the defendant to serve his terms consecutively as part of an overall sentencing plan, the district court is not required to specifically tie the reasons to the imposition of consecutive sentence.

*Johnson,* 445 N.W.2d at 343.[3]

■ In its written order, the district court stated the following reasons for the sentence imposed as the "Defendant's age," "the nature and circumstances of this offense, including the ongoing nature of the offense," the "Defendant's need for rehabilitation and the Defendant's potentiality therefor," "[t]his sentence will hold the Defendant accountable for his actions and should act as a deterrent," and "will provide for the protection of the community." In *State v. Lumadue,* 622 N.W.2d 302, 304 (Iowa 2001), the court found that such written "boilerplate," without more, does not satisfy the requirements of rule 2.23(3)(d).

Here, the trial court announced the sentences as follows:

> On Count I, that is the stalking charge, it is the judgment and sentence

---

**2.** As was noted in *Connor,* 973 A.2d at 656:

> We emphasize that the issue to be decided on remand is not whether the defendant lacked the technical legal skill or knowledge to conduct the trial proceedings effectively without counsel.... That fact, however, has no bearing on whether he was competent to represent himself for purposes of *Edwards.* Rather, the determination of his competence or lack thereof must be predicated solely on his ability to "carry out the basic tasks needed to present his own defense without the help of counsel"; [*Edwards,* 554 U.S. at ——, 128 S.Ct. at 2386, 171 L.Ed.2d at 356]; notwithstanding any mental incapacity or impairment serious enough to call that ability into ques-

> tion. Of course, in making this determination, the trial court should consider the manner in which the defendant conducted the trial proceedings and whether he grasped the issues pertinent to those proceedings, along with his ability to communicate coherently with the court and the jury.

**3.** We note, however, that in *Johnson,* the trial court referenced the presentence investigation report in its sentencing order, which recommended consecutive sentences, and the trial court stated, "The Court finds that these are two separate offenses and that the sentences shall run consecutively." *Johnson,* 445 N.W.2d at 343.

of this Court that you are remanded to the custody of the Director of the Iowa Department of Corrections for an indeterminate term not to exceed five years. The Court is required to impose the minimum sentence of $750, which I suspend. I'm ordering you to pay the costs of that action as well as your court-appointed attorney fees.

With regard to Count II, the offense of tampering with a witness, an aggravated misdemeanor, it is the judgment and sentence of this Court that you are remanded to the custody of the Director of the Iowa Department of Corrections for an indeterminate term not to exceed two years. These sentences will run consecutively, that is, one after the other.

The Court will further order that the Iowa Medical Classification section, Department, perform a psychiatric evaluation as part of your classification process at that institution with the hope that they will provide mental health counseling, treatment, whatever their evaluation indicates is necessary in your case. The fine in that matter, the minimum fine of $[650] is imposed but suspended. The costs of that action are assessed against you as well as any court-appointed attorney fees.

The Court's reasons for this sentence include the nature and circumstances of the offense, the ongoing nature of the offense, the continuing course of contact, Mr. Jason, and while you assure me today you would not violate probation, that you would not break those no contact orders, your behavior in the past has proved otherwise over and over. Your statements have indicated otherwise over and over. The court has no assurance that that conduct would not be as you have historically shown us to violate and disregard court orders.

The Court understands the threats that you have made of future actions against the victim, which indicates to the Court, not an indictment of any future acts, but of your attitude about whether or not you are willing to comply with the Court's orders that might occur in a probationary kind of situation.

 The district court provided sufficient reasons to support its decision to impose a term of incarceration. It cited the nature of the offenses, their ongoing nature, and the continuing course of contact by Jason. However, the court did not provide any reasons for its decision to impose consecutive sentences. *See State v. Jacobs*, 607 N.W.2d 679, 690 (Iowa 2000) (vacating sentences where court failed to state reasons for imposing consecutive sentences). Although the reasons given for imposing consecutive sentences may be the same reasons for granting probation, reasons must be identified. *Id.* Here, the trial court provided no explanation for the imposition of consecutive sentences during the sentencing hearing or in the sentencing order. Since the trial court gave sufficient reasons for imposing incarceration, we vacate only that portion of the sentence imposing consecutive sentences and remand for the purpose of determining whether the sentences should run consecutive or concurrent. *See State v. Ayers*, 590 N.W.2d 25, 33 (Iowa 1999) (vacating only a portion of a sentence and remanding for resentencing on those portions of the sentence).

## IV. Summary.

Jason's competency to stand trial does not equate to competency to represent himself at trial in light of his diagnosis of Asperger's Syndrome. We therefore remand for a hearing which may include the presentation of evidence, to determine if Jason was competent to represent himself

under the standards established in *Edwards*. We also vacate the portion of the sentence imposing consecutive sentences as the court did not sufficiently state its reasons for ordering consecutive sentences. On remand, if the trial court determines Jason was not competent to represent himself, the trial court shall grant Jason a new trial. If the court concludes Jason was competent under the *Edwards* standards, the trial court shall determine, and provide reasons, for whether the sentences upon his convictions shall run consecutively or concurrently.

**AFFIRMED IN PART, SENTENCE VACATED IN PART, AND REMANDED.**