**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

KURT F. JOHNSON,
    *Defendant-Appellant.*

No. 08-10147

D.C. No.
3:05-cr-00611-WHA

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

DALE SCOTT HEINEMAN,
    *Defendant-Appellant.*

No. 08-10258

D.C. No.
3:05-cr-00611-
WHA-1

OPINION

Appeal from the United States District Court
for the Northern District of California
William H. Alsup, United States District Judge, Presiding

Argued and Submitted
May 10, 2010—San Francisco, California

Filed July 6, 2010

Before: Barry G. Silverman, Raymond C. Fisher and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Silverman

9565

**COUNSEL**

Maitrey A. Badami, Badami & Leonida, San Francisco, California; and Kari E. Hong, Law Offices of Kari E. Hong, Oakland, California, for the defendants-appellants.

Laurie Kloster Gray (argued), Joseph P. Russoniello, Barbara J. Valliere, Brigid S. Martin, and C. David Hall, U.S. Attorney's Office for the Northern District of California, San Francisco, California, for the Government-appellee.

**OPINION**

SILVERMAN, Circuit Judge:

Defendants Kurt F. Johnson and Dale Scott Heineman were indicted for conspiracy and multiple counts of mail fraud related to their illegitimate debt-elimination business. They were adamant in their desire to represent themselves and assert an absurd legal theory wrapped up in Uniform Commercial Code gibberish. Both defendants were examined by a psychiatrist and found to have no diagnosable mental disorder. Thereafter, the district court conducted *Faretta*[1] hearings spanning several days in which the defendants were extensively advised of their right to counsel and the disadvantages

---

[1] *Faretta v. California*, 422 U.S. 806 (1975) (establishing that a defendant has the constitutional right to represent himself when he voluntarily and intelligently elects to do so).

of self-representation. The judge practically begged them to accept counsel but they refused. The district court found that the defendants were competent to represent themselves and that such was their constitutional right. Defendants now contend that *Indiana v. Edwards*, 554 U.S. 164 (2008), decided by the Supreme Court after their trial concluded, required the district court to terminate their self-representation because of what they describe as their "nonsensical" legal "antics" after the trial began. They say they may have been competent to stand trial but not to represent themselves.

The record clearly shows that the defendants are fools, but that is not the same as being incompetent. Under both *Faretta* and *Edwards*, they had the right to represent themselves and go down in flames if they wished, a right the district court was required to respect. There was no legal or medical basis to foist a lawyer on them against their will. We also hold today that there was no basis for the recusal of the district judge nor error in any of the jury instructions.

## I.  Background

In 2004-2005, Kurt F. Johnson and Dale Scott Heineman started a debt-elimination program. The premise of their program was that banks had an unfair advantage over borrowers; the program purportedly provided a mechanism for borrowers to eliminate their mortgage debt. The program was entitled the "Dorean Process" and consisted of several steps. Homeowners first transferred their interest in their properties to a trust, naming the defendants as trustees. The defendants then sent demand notices to the lenders questioning the validity of their lending practices. When banks failed to respond or "prove" that their lending practices were valid, the defendants recorded bogus documents with county clerks' offices ostensibly establishing that the homes were no longer subject to a mortgage. The homeowners then refinanced with a different bank using their supposedly unencumbered homes as collateral. In addition to up front fees, Heineman and Johnson also

took as a fee a significant portion of the proceeds of the new loans the homeowners thus obtained. By their own admission, the defendants made over three million dollars in this scheme.

Because the homeowners stopped making their mortgage payments, the initial lenders started sending notices of default and eventually foreclosure notices. In response, Johnson and Heineman sued the banks that were initiating foreclosures. Johnson and Heineman filed fifteen such lawsuits against different banks/lenders, all in the Northern District of California. Judge Alsup dismissed the defendants' first case under Rule 8 of the Federal Rules of Civil Procedure. *See Frances Kenny Family Trust v. World Sav. Bank FSB*, No. C 04-03724, 2005 WL 106792, at *3 (N.D. Cal. Jan. 19, 2005). Judge Alsup also entered an order for Johnson and Heineman's lawyer to show cause why he should not be sanctioned for filing multiple frivolous cases. The lawyer filed a response and also filed a motion to withdraw as counsel and a declaration under seal in support of his motion. He explained in his sealed declaration that some of Johnson's and Heineman's statements to customers were false. He expressed concern that he had been employed in an effort to supply credibility to the possibly illegitimate Dorean Process. Judge Alsup sanctioned the attorney and referred the matter to the United States Attorney's Office.

Johnson and Heineman were indicted on September 22, 2005, and the case was assigned to Judge Alsup because it related to the defendants' prior civil case. The defendants filed a "Writ of Mandamus and Prohibition" in which they moved to recuse Judge Alsup. The motion was referred to Judge Susan Illston. Judge Illston found that the rulings made by Judge Alsup during the prior civil proceedings regarding the defendants' debt elimination scheme were, in effect, all in a day's work, nothing out of the ordinary, contained nothing uncalled for, and did not evince a design to hurt the defendants. She also found that Judge Alsup's referral of the matter to the U.S. Attorney's Office only demonstrated his belief that the law may have been broken, not that he harbored a deep-

seated and unequivocal antagonism that would render fair judgment impossible. The recusal motion was thus denied.

   Judge Alsup then held a series of *Faretta* hearings in which he patiently and thoroughly addressed the issue of self-representation with the defendants. At the first hearing, Judge Alsup addressed Defendant Johnson first:

> THE COURT: Now, Mr. Johnson, you're entitled to a lawyer and if you can't afford one we will appoint one at no expense to you. Do you understand that?
>
> JOHNSON: I understand your offer, yes.
>
> THE COURT: And . . . do you want a lawyer?
>
> JOHNSON: Absolutely not.

Judge Alsup then explained the significance of the right to counsel:

> You're entitled to a lawyer here to help you get through this and to help you identify all the issues and to make the best arguments possible on your behalf, that's important. . . . And it's a right you have under the Constitution. You don't want to give that up without thinking very hard about it. . . .
>
> My job is to try my best get you a fair trial and a fair procedure and right off the bat we need to get you a lawyer and you need — you should have a lawyer.
>
> You do have a right to represent yourself if you really want to, but [a part] of my job is to help you understand why you should not do that and you should have a lawyer, but if at the end of all that you insist on it you can represent yourself if you want[ ] to.

The defendants requested a continuance to allow them to research whether they should accept outside representation and the court granted the continuance.

At the defendants' next hearing the court had an assistant federal public defender present to demonstrate to the defendants that they could in fact have counsel appointed for them. The court explained the advantages of having a lawyer and the disadvantages of not having one:

> If you don't have a lawyer then you have to conduct the case yourself. By that, I mean, you have to make your motions, do legal research, respond to motions made by the Government and to come in and argue them. And it's conceivable someone who's not a lawyer can do an okay job at that, but it's very unlikely because it helps to have the experience of being a lawyer. . . .

> So you must abide by the same rules of the Court as the lawyers do. And if you make mistakes, I can't give you special privileges or benefits, and the judge can't help you. The Government is represented by a trained, skilled prosecutor experienced in criminal law in the court procedures and . . . the procedures you face in this case.

Judge Alsup again asked the defendants if they wanted a lawyer:

> THE COURT: Now, do you want to give up your right to have a lawyer represent you in this case?

> HEINEMAN: Sir, I'm not looking to be represented by anybody.

The court then asked Heineman if he would like to consult with the assistant public defender regarding representation:

> THE COURT: Before you make it clear to me you understand in making that decision — do you want to talk to Mr. Cohen back there from the public defender's office?
>
> HEINEMAN: I don't have anything to say to him at this time.

The court then addressed Johnson who requested another continuance so that he could look into whether he would have access to a law library prior to deciding whether he wanted counsel appointed. The court granted the request and continued the hearing.

Because the defendants were considering representing themselves and because they had made some strange comments in court, the district judge ordered that the defendants undergo mental examinations. James R. Missett, M.D., Ph.D., evaluated the defendants separately at the Federal Corrections Institute in Dublin, California. Both defendants were less than cooperative during their evaluations, but Dr. Missett engaged them for approximately one hour each and filed written reports in which he opined that neither defendant was suffering from any mental disorder. The court held a competency hearing at which Dr. Missett testified in person. The court found the defendants competent to represent themselves based on Dr. Missett's reports and testimony and based on the court's own observations.

The court held one final *Faretta* hearing, advising the defendants once again of the implications of proceeding without an attorney:

> THE COURT: I want to now turn to the two paths that you can go down here. One path is you have a lawyer at no expense to you. We will appoint a lawyer. Each of you will have a separate lawyer, a lawyer who will be yours; not representing the Public

Defender or whatever it would be, representing you and your interest in the case. That would be effective immediately and going all the way through the end of trial. That's one road we can go down.

Another road we can go down is you say, No, I don't want a lawyer and that you want to appear in court and conduct your own defense. You have the right under the Constitution to do that, but I need to make sure that you — before you exercise that right, that you understand you have the right to the lawyer and, also, what some of the advantages and disadvantages are for each of these courses. . . .

That lawyer would help conduct the investigation. That lawyer would review the discovery that's been provided to you, but, also, would follow up on leads. That lawyer would make possible motions to compel further information from the government. The lawyer would have an investigator working with him to go out and ask questions, dig up evidence, try to poke holes in the government's case, and do investigations into some of the witnesses the government may want to bring at trial so that the cross-examinations by the lawyer would be the best possible examinations. . . .

All right. I want to give you another opportunity. I am suggesting very strongly to you that you both should have a lawyer to make out the case here in court in your defense and to poke holes in the government's [case] and to make motions and so forth. . . . It can only help you and it can't hurt you and I suggest that you should do that. Will you let me appoint a lawyer?

JOHNSON: Like I say, your Honor, if you want to

appoint one for the defendant, you are more than welcome to.**²** I do not want one.

THE COURT: Mr. Heineman?

HEINEMAN: That is correct, I do not want one. Appoint one [sic] the defendant.

Despite the defendants' refusal to accept appointed counsel, the district judge did appoint advisory counsel to assist the defendants solely on issues of procedure and courtroom protocol.

On the first day of trial, the court yet again asked the defendants to consider appointment of counsel despite the additional delay that would result; again, both defendants refused. After a month-long jury trial, the defendants were convicted of one count each of conspiracy and thirty-four counts each of mail fraud, in violation of 18 U.S.C. § 1341.

## II.   Self-Representation

Johnson and Heineman argue that the district court should not have permitted them to represent themselves. First, they argue under *Faretta v. California*, 422 U.S. 806, 834 n.46 (1975), and *Illinois v. Allen,* 397 U.S. 337, 343 (1970), that their self-representation should have been terminated because their own courtroom behavior rendered their trial unfair. Second, they argue that under *Indiana v. Edwards*, 554 U.S. 164, 128 S. Ct. 2379 (2008), regardless of whether their behavior required termination under *Faretta*, they were in fact not competent to continue representing themselves. As evidence in

---

[2]One of the defendants' recurring themes in their colloquies with the court was their peculiar theory that they were "sentient human beings" distinct from the abstract titles "Defendants KURT F. JOHNSON and DALE SCOTT HEINEMAN" as they were referred to in the indictment and court documents.

support of these two similar, but distinct, claims that the district court should have forced counsel upon them, they cite their reluctance to provide the court with their names or dates of birth, their campaign of filing meaningless and nonsensical documents, their insistence on wearing their prison garb in front of the jury, and their off-the-wall comments such as Johnson's statement in his opening that he wanted the jury to "enter a guilty plea for us," which he subsequently apologized for, explaining that he "was trying to make a very quick remedy to this procedurally." We have jurisdiction pursuant to 28 U.S.C. § 1291.

**[1]** A defendant's right to self-representation is clearly established. *Faretta*, 422 U.S. at 821. But before electing to represent himself a defendant must be advised of his right to counsel and the dangers and disadvantages of self-representation. *Id.* at 835. Further, a defendant's waiver of the right to counsel must be knowing and voluntary. *Id.* If a defendant persists in his choice to represent himself, that choice must be honored even if it is to his own detriment. *Id.* at 834. Here, there is no question but that the court more than adequately ensured that *Faretta* was satisfied. It is hard to imagine what else the court could or should have said to have explained the hazards of self-representation.

**[2]** Nonetheless, the right to self-representation is not absolute; the constitutional guarantee to a fair trial permits "the trial judge [to] terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." *Id.* at 834 n.46 (citing *Allen*, 397 U.S. at 343). It is an open question what standard of review this court should apply to a district court's decision to permit an obstreperous defendant to represent himself under *Faretta* when there is a risk the trial will violate due process, but we need not decide the applicable standard here because these defendants' claims fail under any of the possible standards of review. It is clear that Johnson and Heineman did not engage in such serious obstructionist conduct that the fairness of their trial was jeop-

ardized, requiring the district court to terminate their self-representation. Defendants argue that termination of self-representation is required when defendants engage in serious misconduct, are unwilling to abide by courtroom protocol, or are extremely disruptive and defiant. But the behavior of the defendants during the trial in this case, while occasionally wacky, was not disruptive or defiant. The defendants filed numerous nonsensical pleadings, were uncooperative at times, and chose to wear their prison garb during trial, but they did not exhibit a blatant disregard for courtroom rules or protocol and did not make it impossible for the court to administer fair proceedings. In fact, they made opening statements, closing arguments, cross-examined witnesses, argued jury instructions, and testified on their own behalf. They did not disrupt the proceedings or have to be gagged, shackled, or removed from the courtroom. *See United States v. Mack*, 362 F.3d 597, 600-03 (9th Cir. 2004) (holding self-representation should have been terminated where defendant's behavior led to the trial court's exclusion of the defendant from the courtroom and the denial of the defendant's right to call witnesses and conduct closing argument). The defendants' courtroom behavior, although eccentric at times, would not have justified, let alone required, the involuntary deprivation of their constitutional right to represent themselves.

**[3]** Defendants next argue that they were not competent to represent themselves, *Faretta* notwithstanding, under the Supreme Court's decision in *Indiana v. Edwards*, 554 U.S. 164, 128 S. Ct. 2379 (2008). Until recently, if a defendant was determined to be competent to stand trial he was also deemed competent to represent himself. *Godinez v. Moran*, 509 U.S. 389, 399 (1993). The Supreme Court clarified in *Edwards*, however, that a trial court may insist on representation for a defendant who is competent to stand trial but who is suffering from severe mental illness to the point where he is not competent to perform the more arduous task of representing himself. *Edwards*, 554 U.S. at ___, 128 S. Ct. at 2388. The Court concluded that the constitutional guarantee of a fair trial permits

a district court to override a *Faretta* request for defendants whose mental disorder prevented them from presenting any meaningful defense. *Id.*

As an initial matter, we have not yet articulated the applicable standard of review to be applied to *Edwards* challenges. *See United States v. Thompson*, 587 F.3d 1165, 1171 & n.2 (9th Cir. 2009) (assuming abuse of discretion); *United States v. Ferguson*, 560 F.3d 1060, 1070 n.6 (9th Cir. 2009). Because *Edwards* holds that the Constitution "permits" interfering with a *Faretta* request for "gray area" defendants, it suggests an abuse of discretion standard. *See United States v. Berry,* 565 F.3d 385, 391 (7th Cir. 2009); *United States v. DeShazer*, 554 F.3d 1281, 1290 (10th Cir. 2009). However, that does not directly affect the question raised by the defendant here, which is when, if ever, the Constitution *requires* a court to impose counsel on a "gray area" defendant despite a voluntary and knowing waiver. Given the nature of the distinction between that which is constitutionally required and that which is merely constitutionally permitted, *see Edwards*, 554 U.S. at ___, 128 S. Ct at 2385 (noting relevance of that distinction), the standard of review to be applied to *Edwards* challenges in which a *Faretta* request was granted may require different analysis than provided by *Edwards* itself, in which the *Faretta* request was denied. We have no need to reach these difficult questions here, however, because the defendants in this case fail to get through the door to making an *Edwards* claim at all, because they were clearly fully competent, albeit foolish, to represent themselves. We review the district court's factual finding that the defendants were competent to represent themselves for clear error. *See United States v. Friedman*, 366 F.3d 975, 980 (9th Cir. 2004); *see also Edwards*, 554 U.S. at ___, 128 S. Ct. at 2387 ("[T]he trial judge, particularly one such as the trial judge in this case, who presided over one of [the defendant's] competency hearings and his two trials, will often prove best able to make more fine-tuned mental capacity decisions, tailored to the

individualized circumstances of a particular defendant.”); *DeShazer*, 554 F.3d at 1286.

We recently applied *Edwards* in *United States v. Ferguson*, 560 F.3d at 1069, and *United States v. Thompson*, 587 F.3d at 1171-73. In *Ferguson*, the district court acquiesced in a defendant’s request for self-representation despite his bizarre courtroom behavior because the court felt it could not force representation upon Ferguson under the law. After the trial, but while the appeal was still pending, the Supreme Court decided *Edwards*. On appeal, we remanded to the district court to allow it to decide whether the opinion in *Edwards* would have affected its decision to allow Ferguson to represent himself. *Ferguson*, 560 F.3d at 1070.

In concluding that remand was appropriate we relied on the fact that the psychiatric reports regarding Ferguson focused on whether he was competent to assist counsel at trial, not whether he was competent to represent himself. *Id*. at 1068. We also focused on Ferguson’s failure to do *anything* at his trial: he conducted no voir dire, gave no opening, gave no closing, conducted no cross-examination, and called no witnesses. *Id*. at 1069. We noted that this absence of a defense seriously jeopardized the fairness of his trial or at least the appearance of fairness. *Id*. We found most important the implication in the record that the district court might have forced counsel upon Ferguson had the district court had the benefit of the decision in *Edwards*. *Id*.

Subsequently, in *Thompson*, we determined that no remand was necessary under *Edwards* where a defendant’s self-reported mental problems and vacillations regarding self-representation appeared manufactured as a tactic to delay trial. *Thompson*, 587 F.3d at 1173. On the morning of trial, after multiple continuances and a competency hearing, Thompson advised the court that he wished to represent himself and would need additional time to prepare for trial. *Id*. at 1168. The court conducted a *Faretta* hearing and strongly

urged Thompson to reconsider self-representation but finally relented and granted Thompson's request to represent himself. *Id.* at 1168-70.

In *Thompson*, we contrasted the factual circumstances there with those in *Ferguson*. *Thompson*, 587 F.3d at 1172-73. Specifically, we relied on evidence in the record indicating that the district court properly evaluated Thompson's ability to represent himself rather than merely his competence to stand trial. *Id.* We also noted the difference between Ferguson's total lack of activity at trial and Thompson's lengthy colloquies with the court in which he seemed "acutely aware of what was occurring." *Id.* at 1173. We held that the district court did not abuse its discretion in concluding that Thompson was competent to represent himself. *Id.*

**[4]** In this case, the district court did not err in concluding that Johnson and Heineman were competent to represent themselves. The district court had the defendants psychiatrically evaluated and held a competency hearing in which it properly considered *both* their competence to represent themselves *as well as* their competence to stand trial. The doctor who evaluated the defendants concluded that there was no evidence that either was suffering from any mental disorder. And the district court found that "both defendants are able to comprehend information as it is received by them in a normal manner without any mental defect whatsoever; that they are able to express themselves coherently and appropriately, sometimes even with great articulation." Most importantly, the district court concluded, "[t]hey are able to assist in their own defense . . . if they had counsel. Or if they don't have counsel, *to assist themselves in conducting the defense*." The district court, even without the benefit of *Edwards*, presciently contemplated whether the defendants had the mental capacity to represent themselves, not just the competence to stand trial, and it found that they did.

**[5]** The record amply supports the district judge's determination. The defendants gave opening statements, testified,

examined and cross-examined witnesses, challenged jury instructions, and delivered closing arguments of significant length. The district court was in the best position to observe the defendants' behavior and to make the determination that the defendants had the mental capacity to represent themselves. *Edwards,* 554 U.S. at ___, 128 S. Ct. at 2387; *Ferguson*, 560 F.3d at 1070. The concerns present in *Ferguson* over the defendant's total failure to present *any* defense are not implicated by the record in this case. Nor is there any evidence of any mental illness whatsoever on the part of either defendant in this case, unlike the defendant in *Edwards*. *See Edwards*, 554 U.S. at ___, 128 S. Ct. at 2382-83 (discussing the defendant's schizophrenia).

**[6]** In sum, the district judge conducted three *Faretta* hearings spanning several days in which he repeatedly and thoroughly advised the defendants of their right to counsel, the pitfalls of self-representation, and their right to change their minds. The defendants unequivocally demonstrated their understanding of the situation and their adamant desire to represent themselves, as was their right. They were examined by a psychiatrist and found to be fine. In the absence of any mental illness or uncontrollable behavior, they had the right to present their unorthodox defenses and argue their theories to the bitter end.

### III.   Recusal

**[7]** We review the denial of a recusal motion for an abuse of discretion. *Pesnell v. Arsenault*, 543 F.3d 1038, 1043 (9th Cir. 2008). Johnson and Heineman argue that Judge Alsup should have been recused because he presided over their prior civil case and they say he received extrajudicial information that biased him against them. Title 28 U.S.C. § 455(a) provides "[a]ny . . . judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Section 455(b)(1) further provides that the judge shall disqualify himself "[w]here he has a per-

sonal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1).

**[8]** The Supreme Court analyzed the evolution of these sections and the scope of their application in *Liteky v. United States*, 510 U.S. 540, 543-56 (1994). *Liteky* addressed both courtroom bias and the extrajudicial source doctrine, the situation in which a judge is allegedly biased based on information acquired outside of judicial proceedings. *Id.* at 554-55. The Court held that judicial rulings or information acquired by the court in its judicial capacity will rarely support recusal. *Id.* at 555. The Court explained that if information is acquired during court proceedings, only exceptionally inflammatory information will provide grounds for recusal based on bias or prejudice:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.

*Id.* The Court also held that extrajudicial sources are neither necessary nor sufficient alone to warrant recusal on bias or prejudice grounds. *Id.* at 554.

We have described the extrajudicial source factor as involving "something other than rulings, opinions formed or statements made by the judge during the course of trial." *United States v. Holland*, 519 F.3d 909, 914 (9th Cir. 2008). We have provided an objective test for determining whether recusal is required: "whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Clemens v. U.S. Dist. Court for the Cent. Dist. of Cal.*, 428 F.3d 1175, 1178 (9th Cir. 2005).

We have also noted several factors that are ordinarily insuffi-cient to require recusal including the following:

> [T]he mere fact that a judge has previously expressed . . . a dedication to upholding the law or a determination to impose severe punishment within the limits of the law upon those found guilty of a particular offense; [ ] prior rulings in the proceeding, or another proceeding, solely because they were adverse; [ ] mere familiarity with the defendant(s), or the type of charge, or kind of defense presented.

*Id.* at 1178-79.

**[9]** Judge Illston did not abuse her discretion in denying the defendants' motion to recuse Judge Alsup. Judge Alsup's dismissal of the defendants' prior civil case, his order of sanc-tions against their attorney, his award of costs and fees to the civil defendants, and his referral of the matter to the U.S. Attorney's Office were judicial actions that will not serve as bases for recusal absent unusual circumstances not present here. *Liteky*, 510 U.S. at 555. Adverse findings do not equate to bias. Nothing Judge Alsup did was outside of his official duties or even shown to be erroneous in any way. Further, the defendants' civil attorney's declaration filed under seal in their civil case did not constitute an extrajudicial source potentially prejudicing Judge Alsup; it was an event occurring in the course of prior proceedings. *Id.* It was not an abuse of discretion for Judge Ilston to conclude that Judge Alsup's prior rulings did not display a "deep-seated favoritism or antagonism that would make fair judgment impossible," *id*., or suggest that "his impartiality might reasonably be ques-tioned," 28 U.S.C. § 455(a).

## IV.   Jury Instructions

When a defendant has objected to a jury instruction at trial, we review for an abuse of discretion. *United States v. Harri-*

*son*, 585 F.3d 1155, 1160 (9th Cir. 2009). In formulating jury instructions, the trial court is afforded "substantial latitude so long as its instructions fairly and adequately cover the issues presented." *United States v. Hicks*, 217 F.3d 1038, 1045 (9th Cir. 2000) (internal quotation marks omitted). Johnson and Heineman argue that Jury Instructions Eighteen and Nineteen constituted findings of fact that were forced upon the jury and consequently reduced the government's burden of proof. Jury Instruction Eighteen defined terms such as "note," "deed of trust," "family trust," and "mortgage." It also explained the legal obligations of lenders and borrowers when a loan is made. Jury Instruction Nineteen stated that nothing in the Uniform Commercial Code or other banking or accounting laws would alter the legal principles contained in the other instructions.

[10] The court's instructions were not findings of fact, as the defendants now claim. The instructions were simply correct statements of the law and did not invade the province of the jury or reduce the government's burden of proof. *See Hicks*, 217 F.3d at 1045-46.

## V.   Conclusion

For the foregoing reasons, the defendants' convictions are AFFIRMED.