FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

STEVEN AUDETTE,
*Defendant-Appellant.*

No. 17-10017

D.C. No.
2:14-cr-00858-SPL-1

OPINION

Appeal from the United States District Court
for the District of Arizona
Steven Paul Logan, District Judge, Presiding

Argued and Submitted February 4, 2019
Phoenix, Arizona

Filed May 14, 2019

Before: MICHAEL DALY HAWKINS, MILAN D.
SMITH, JR., and ANDREW D. HURWITZ, Circuit
Judges.

Opinion by Judge Milan D. Smith, Jr.

**SUMMARY**[*]

**Criminal Law**

The panel affirmed the defendant's convictions as to 81 counts, reversed his convictions as to 10 counts, and remanded for sentencing on an open record, in a case in which the defendant fraudulently obtained millions of dollars from victims by telling them that he needed to pay CIA and FBI agents to protect him and his family from the Mafia, and by promising that he would pay them back after he inherited millions from an organized-crime figure.

The panel held that the district court did not clearly err when it found that the defendant's waiver of counsel was unequivocal, that the district court did not err in concluding that the defendant knowingly and intelligently waived his right to counsel, and that the district court did not err by failing to conduct a second *Faretta* hearing after the defendant filed a motion requesting "a new counsel advisor."

The panel rejected the defendant's contention that the district court erred under *Indiana v. Edwards*, 554 U.S. 164 (2008), in concluding that the defendant was competent to represent himself. The panel explained that the fact the defendant presented an unorthodox and ultimately unsuccessful defense does not warrant finding that he could not represent himself.

The panel held that even if the district court's admission of an agent's testimony about statements made to him by the

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

defendant's wife and stepdaughter violated the Confrontation Clause, any error was harmless.

The government agreed with the defendant that the district court erred in denying his motion for judgment of acquittal on 10 counts due to insufficiency of the evidence. The panel accordingly reversed the convictions for those counts and remanded with instructions that the district court enter a judgment of acquittal on those counts.

As to the defendant's allegations of three instances of prosecutorial misconduct during trial, the panel held that there was no plain error that affected the defendant's substantial rights.

The panel held that the district court did not abuse its discretion by not granting the defendant a continuance.

Rejecting the defendant's contention that the cumulative effect of three errors warrants reversal, the panel noted that the defendant did not demonstrate that the district court committed any error.

The panel held that the district court did not err by declining to construe the defendant's motions for mistrial as motions for a new trial, and did not abuse its discretion when it denied the motions.

## COUNSEL

Elizabeth J. Kruschek (argued), Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender; Office of the Federal Public Defender, Phoenix, Arizona; for Defendant-Appellant.

Rachel C. Hernandez (argued), Assistant United States Attorney; Krissa M. Lanham, Deputy Appellate Chief; Elizabeth A. Strange, First Assistant United States Attorney; United States Attorney's Office, Phoenix, Arizona; for Plaintiff-Appellee.

---

## OPINION

M. SMITH, Circuit Judge:

Between the early 1990s and 2003, Steven Audette obtained millions of dollars from victims by telling them that he needed to pay CIA and FBI agents to protect him and his family from the Mafia. Audette promised that he would pay the victims back in due time—he was, after all, a purported relative of Lucky Luciano,[1] and slated to inherit millions of dollars any day. But if they refused to pay, the consequences were dire: Audette and his family would be killed, and the victims would be kidnapped, tortured, murdered, and mutilated.

As it turned out, the Mafia was not after Audette, and he was not related to Luciano. After a trial in which Audette represented himself, a jury found Audette guilty of 90 counts of wire fraud and one count of conspiracy to commit wire fraud. He was sentenced to 240 months in prison. On appeal, Audette argues that: (1) his waiver of counsel was invalid; (2) he was not competent to represent himself; (3) he

---

[1] A 20th century organized crime figure, Luciano acquired enormous wealth through, among other things, sales of stolen property and bootleg alcohol, narcotics trafficking, and prostitution. *See generally* Christian Cipollini, *Lucky Luciano: Mysterious Tales of a Gangland Legend* (2014).

was denied his Sixth Amendment right to confront the witnesses against him; (4) insufficient evidence supported his conviction for ten of the fraud counts; (5) the government committed misconduct during trial; (6) the district court erred by not granting him a continuance; (7) his trial suffered from cumulative error; and (8) the district court erred in denying his post-trial motions. Audette also argues that his sentence was procedurally and substantively unreasonable.

We affirm in part and reverse in part Audette's conviction, vacate his sentence, and remand the case for resentencing on an open record.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

Audette was indicted for 90 counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. At Audette's arraignment, Brian Borrelli was assigned to represent him.

## I. Psychological Evaluations

The district court ordered that Audette undergo a psychological evaluation. That evaluation established that Audette was not competent to stand trial. The evaluation report stated that Audette's behavior "strongly suggests the presence of a delusional disorder" and that Audette "exhibits borderline personality traits." As a result, the district court ordered Audette to remain in custody for hospitalization and psychiatric treatment.

---

[2] We have ordered Audette's Excerpts of Record Volume Seven, filed under seal, be unsealed for the purpose of addressing Audette's arguments about his competency to represent himself.

A few months later, a federal medical center issued a Certificate of Restoration of Competency to Stand Trial, certifying that Audette "is able to understand the nature and consequences of the proceedings against him and to assist properly in his own defense." An evaluation report that accompanied the Certificate stated that Audette likely suffered from malingering and exhibited traits of Antisocial Personality Disorder and Narcissistic Personality Disorder. Despite that condition, however, Audette was competent to stand trial because he "expressed a thorough understanding of the specifics of his charges" and "demonstrated adequate rational ability to consider potential legal options at trial."

The district court, with no objection from either party, found Audette competent to stand trial.

## II. *Faretta* Hearing

When proceedings continued, Audette several times moved for new counsel. The district court denied those motions.

Borrelli then filed a motion stating that Audette wished to represent himself. The next day, the court held a *Faretta* hearing to consider that motion.[3] The court asked Audette whether he had read the indictment; Audette said that he had. The court asked Audette whether he understood the charges against him; Audette responded that he did. The court asked Audette whether he was aware of the maximum penalties for each of the charges against him; Audette said he understood

---

[3] "Once a defendant makes an unequivocal request to proceed pro se, the court must hold a hearing—commonly known as a *Faretta* hearing—to determine whether the defendant is knowingly and intelligently forgoing his right to appointed counsel." *United States v. Farias*, 618 F.3d 1049, 1051–52 (9th Cir. 2010).

those too. The court asked several questions about Audette's familiarity with legal rules and procedure, and Audette represented that he either knew of the rules or could learn them. The court also gave Audette some advice: "[I]n my opinion . . . you would be better defended by a trained lawyer such as Mr. Borrelli. And I highly recommend that you continue on with Mr. Borrelli. And I think it wouldn't be wise if you tried to represent yourself."

Following that colloquy, the court asked Audette whether he still wished to represent himself. Audette responded:

> It's my wish—I mean, I want Mr. Borrelli to represent me. Okay? Mr. Borrelli's a trained attorney, and I understand that. . . . if there's any way that I can have Mr. Borrelli represent me, but I can also get the truth out about what happened, that's what I want. I want to tell my story without interruption.

Audette admitted that he was "scared to death to represent myself . . . because I know that I don't stand a chance against the prosecution."

The court said that it was "somewhat confused" by Audette's answer. Audette responded that he wanted to represent himself but, after hearing the court's questions, found the task "daunting." Audette said that "if I could work with Mr. Borrelli, get the truth out and come to some common ground where, you know, he could present what he feels is important, I could present what I feel is important, I'd much rather have a trained attorney. . . . there's no question about it." The court reminded Audette that "Mr. Borrelli has already indicated to the [c]ourt that it's not his plan to pursue some of the things that you would like him to

pursue." The court offered to appoint Borrelli as advisory counsel, a role in which he could "assist [Audette] with the case." The court made clear, however, that "ultimately[,] all the decision making will fall on [Audette]." The court again asked Audette whether he wished to represent himself.

Audette asked to speak with Borrelli. After a five-minute conversation, the court reconvened. The court asked Audette: "Is it your wish to represent yourself pro se?" Audette responded: "Yes, sir, it is." The court granted Audette's motion for self-representation and appointed Borrelli as advisory counsel.

## III.    Trial

Shawn Warwick, Audette's friend from chiropractic school, testified that Audette called him in the early 1990s to ask for a loan of $400. Warwick sent Audette the money. But that was far from the end of it: Warwick soon began receiving weekly calls from Audette asking for more money. Warwick continued sending money to Audette and, at Audette's direction, to members of Audette's family. Audette later told Warwick that he needed the money because "he was actually running from the Mob." Audette said that he was working with the CIA and FBI and needed the money to fund his protection from members of the Mafia who were after him and his family. Audette soon began threatening Warwick, telling him that if he did not send Audette money, Warwick's family would be killed. Besides sending Audette money, Warwick paid for Audette's moving expenses several times after Audette told him that the Mafia had discovered his location.

When Warwick ran out of money, he asked one of his patients, Louise Moore, if she too would pay Audette. Moore initially hesitated but, soon enough, sent $10,000 to

Audette.  Audette began communicating directly with Moore and repeated his claims about his family's run from the Mafia.  Audette also threatened Moore, telling her that, if she didn't send him money, "[her] daughter and [Moore] would go to prison . . . [they] would be snatched away . . . [they] would probably have [a] home invasion," and that her grandchildren "would be taken from [her and] first raped" before being "sold into sexual slavery."  Before Audette was arrested, Moore's daughter also fell victim to his fraudulent scheme.

After the government put on its case, Audette moved for a directed verdict under Federal Rule of Criminal Procedure 29.  The court denied the motion.

Audette then presented his case.  He testified that members of the Mafia had tried to recruit him because he was Luciano's grandson.  When Audette refused, the mobsters told him that they would "kill [him] and [his] family."  As a result, Audette and his family went on the run and sought protection from CIA and FBI agents, who promised that they could "end this case for [Audette]" if he paid them.  Audette admitted to taking money from the victims, but testified that he did so only under orders from federal agents.  He also testified that he always intended to pay back the victims.

After testifying, Audette told the court that he had subpoenaed three witnesses: (1) his sister; (2) his stepdaughter; and (3) his son.  The court told Audette that it "want[ed] to make sure you have everything you need to adequately defend yourself so I'll give you whatever time you need."  The court continued the case for four days to give time for Audette's witnesses to be served and appear.

On the day that the trial resumed, Audette learned that, although his sister and stepdaughter were present, his son could not travel to court because he had neither a social security number nor "identification of any kind." Audette called his sister and stepdaughter to the stand. After they testified, the defense rested.

After less than 90 minutes of deliberation, the jury found Audette guilty of all 91 counts.

## IV.    Post-Trial Motions

Audette filed several post-trial motions styled as motions for mistrial. The district court construed them as motions for judgment of acquittal and denied them.

## V.  Sentencing

The presentence investigation report (PSR), using the 2012 U.S. Sentencing Guidelines Manual (the Guidelines), calculated Audette's total offense level as 27. Audette and the government both objected to the PSR.[4] The court sustained all of the government's objections to Audette's offense level calculation and overruled all of Audette's objections. The court found an offense level of 37 (including enhancements), which made Audette's Guidelines sentence range 210–262 months in prison. The court sentenced Audette to 240 months in prison on each of the 91 counts, each sentence to run concurrently.

---

[4] Audette had been appointed sentencing counsel, who also filed objections and responses to the government's responses to the PSR.

## ANALYSIS

### I.  Waiver of Counsel

The Sixth Amendment "guarantees a [criminal] defendant a right to counsel but also allows him to waive this right and to represent himself *without* counsel." *United States v. Erskine*, 355 F.3d 1161, 1167 (9th Cir. 2004) (citing *Faretta v. California*, 422 U.S. 806, 820 (1975)).  To successfully invoke the right of self-representation, a defendant's waiver of counsel must be "timely, not for the purposes of delay, unequivocal, and knowing and intelligent." *Id.*

We review the validity of a *Faretta* waiver, a mixed question of law and fact, de novo. *United States v. Lopez-Osuna*, 242 F.3d 1191, 1198 (9th Cir. 2000).  A district court's finding that a defendant's waiver was unequivocal is a finding of fact reviewed for clear error. *United States v. Marks*, 530 F.3d 799, 816 (9th Cir. 2008).

Audette contends that his waiver of counsel was invalid for three reasons.  First, he argues that his waiver was not unequivocal.  Second, he argues that his waiver was not knowing and intelligent.  Third, he faults the district court for not renewing its inquiry into his request to represent himself.  We address each argument in turn.

### A.  Unequivocal

For a defendant's request to be unequivocal, the "defendant must make an explicit choice between exercising the right to counsel and the right to self-representation so that a court may be reasonably certain that the defendant wishes to represent himself." *United States v. Arlt*, 41 F.3d 516, 519 (9th Cir. 1994).

Relying on our decision in *United States v. Kienenberger*, 13 F.3d 1354 (9th Cir. 1994), Audette contends that the district court's statement that it could "appoint Mr. Borrelli as standby advisory counsel" for Audette rendered his waiver equivocal.

*Kienenberger*, however, does not support the weight that Audette places on it. There, we held the defendant's waiver to be equivocal because "on numerous occasions," he accompanied his requests for self-representation with "insistence that the court appoint 'advisory' or 'standby' counsel to assist him on procedural matters." *Id.* at 1356. Here, Audette did not make such requests; it was the court that offered to appoint Borrelli as standby counsel, while making it clear that, "ultimately[,] all the decision making will fall on [Audette]." Most importantly, when Audette stated that he wished to represent himself, he did not mention advisory counsel. Accordingly, Audette's waiver was not equivocal under *Kienenberger*.

Audette also argues that his waiver was equivocal because of what he said at the *Faretta* hearing before stating that he wished to represent himself. Audette told the court that he "want[ed] Mr. Borrelli to represent [him] . . . I'm scared to death to represent myself, in all honesty, I'm scared to death because I know that I don't stand a chance against the prosecution." A few seconds later, he told the court that "when I heard you go over all the things I need to know to adequately defend myself . . . it's daunting. . . . I don't want to go toe to toe with the prosecution. That's like me going up against Mike Tyson in a boxing match."

Standing alone, such statements might make a waiver of counsel equivocal. *See Mendez-Sanchez*, 563 F.3d 935, 946 (9th Cir. 2009). But after making those statements, Audette told the district court: "Yes, sir, it is" in response to whether

"it [is] your wish to represent yourself pro se?"   That statement was not an "impulsive response" to the court's question—Audette took five minutes to deliberate with Borrelli before responding to the court's question.   *Cf. Jackson v. Ylst*, 921 F.2d 882, 888 (9th Cir. 1990). Accordingly, Audette "appears to have given the issue serious thought," which supports our conclusion that Audette's waiver of counsel was unequivocal.  *United States v. Robinson*, 913 F.2d 712, 714 (9th Cir. 1990).

We have previously rejected, and now reject again, Audette's suggestion that his equivocal statements earlier in the hearing tainted his final, unequivocal waiver of counsel. *See, e.g.*, *United States v. Berthold*, 953 F.2d 1388 (9th Cir. 1992) (table) (defendant's waiver was not equivocal simply because he "periodically vacillate[d] about his desire to proceed pro se").  Whether to waive the right to counsel is an important decision that has serious ramifications for a defendant's trial.  Indeed, the very purpose of a *Faretta* hearing is to ensure that a defendant is "made aware of the dangers and disadvantages of self-representation" before choosing to do so.  422 U.S. at 835.  Audette's expressions of trepidation demonstrate that he understood and grappled with the difficult decision.  *See Tamplin v. Muniz*, 894 F.3d 1076, 1085 (9th Cir. 2018) ("A defendant's choice to represent himself necessarily entails a weighing of pros and cons.").  That is precisely what should have happened.

Cognizant of the ramifications of the decision, Audette admittedly hesitated at first to waive his right to counsel.  But after engaging in a colloquy with the court, thinking about the decision for some time, and consulting with Borrelli, Audette unequivocally stated that he wished to represent himself.  Accordingly, the district court did not clearly err when it found that Audette's waiver was unequivocal.

### B.  Knowing and Intelligent

"Because a defendant who exercises the right to self-representation foregoes the benefits of exercising the right to counsel, 'the accused must "knowingly and intelligently" forego those relinquished benefits.'" *United States v. Gerritsen*, 571 F.3d 1001, 1007 (9th Cir. 2009) (quoting *Faretta*, 422 U.S. at 835).  For a defendant's waiver to be knowing and intelligent, the court must make him aware of the nature of the charges against him, the possible penalties he will face, and the dangers and disadvantages of self-representation. *Erskine*, 355 F.3d at 1167.  The district court need not, however, "recite a particular script when making [its] inquiry." *Id.* at 1168.

In response to questions from the court, Audette said that he had read the indictment and understood the charges against him.  He also stated that he was aware of the maximum penalties for each of the charges.  The court warned Audette that if he chose to represent himself, the judge "can't tell you how to try your case or advise you in any way."  The court also advised Audette that he "would be better defended by a trained lawyer such as Mr. Borrelli," and "strongly urge[d] [Audette] not to represent [him]self."  Despite these warnings, Audette stated that he wished to do so.

Audette nonetheless argues that his waiver was not knowing and intelligent because the court "did not specifically review with Mr. Audette the elements of the offense or the maximum penalties, but instead asked him if he was aware of those facts."  But that contention ignores the focus of our analysis, which is whether "a fair reading of the record as a whole" indicates that the defendant "understood the dangers and disadvantages of self-representation." *United States v. Kelm*, 827 F.2d 1319, 1322 (9th Cir. 1987),

*overruled on other grounds by United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007) (en banc); *accord United States v. McConnell*, 749 F.2d 1441, 1451 (10th Cir. 1984) (noting that "it would be absurd . . . to believe that [the defendant] did not make a knowing and intelligent waiver" simply because "[t]he court did not literally inform" him of the charges and penalties and the dangers of self-representation). Here, the exchange between Audette and the court demonstrates that Audette understood those risks.

We also find Audette's reliance on *McCoy v. Louisiana* unavailing. 138 S. Ct. 1500 (2018). *McCoy*'s upshot is that a criminal defendant has the autonomy to decide the objectives of his defense. *Id.* at 1508. Although a represented defendant surrenders control over tactical decisions, such as which witnesses to call and which arguments to advance, he retains the authority to make decisions such as "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." *Id.* With these principles in mind, *McCoy* held that the decision of whether to admit guilt remains with the client. *Id.* at 1510–11.

Audette contends that the district court erred under *McCoy* because "there is ample evidence suggesting that Mr. Audette's request for self-representation was based on his desire to assert his innocence and his attorney's refusal to honor that objective." That contention, however, is not supported by the record. At Audette's *Faretta* hearing, Borrelli explained that Audette disagreed with "the arguments that I may make . . . he doesn't like some of them." The disagreement between Audette and Borrelli was not over the objectives of Audette's defense, therefore, but instead over the ways to achieve those objectives. Such

tactical decisions are within the attorney's province. *Id.* at 1508.

Audette also points to a motion he filed after the *Faretta* hearing, in which he contended that he was "forced to go pro se" because counsel was "going to use the insanity plea." Had Borrelli presented an insanity defense over Audette's objection, Audette would have a claim of ineffective assistance of counsel. *See United States v. Read*, 918 F.3d 712, 721 (9th Cir. 2019). But Borrelli did no such thing. The only reference in the record to Audette's mental health was at a hearing in November 2014—over a year-and-a-half before Audette's trial—in which Borrelli stated that he thought "mental health [was] an issue" that he was "exploring at the moment." Borrelli did not state that he wished to raise an insanity defense, and the court made clear to Audette that "there's been no clinical diagnosis of anything." Accordingly, *McCoy* and *Read* are not implicated by this case.

The district court did not err in concluding that Audette knowingly and intelligently waived his right to counsel.

## C.  Second *Faretta* Hearing

Having concluded that Audette's waiver of counsel was unequivocal, knowing, and voluntary, we consider whether that waiver was nullified by subsequent events so as to require another *Faretta* hearing. A defendant's waiver remains valid and in effect throughout a criminal proceeding "unless intervening events substantially change the circumstances existing at the time of the initial colloquy." *United States v. Hantzis*, 625 F.3d 575, 580–81 (9th Cir. 2010). A defendant must expressly request appointment of counsel for later proceedings or suggest that his waiver was

limited to a particular stage of the proceedings for his initial waiver to lapse. *Id.* at 581.

Audette argues that his waiver of counsel lapsed when, after his *Faretta* hearing, he filed a motion requesting "a new counsel advisor." In that motion, Audette stated that he had "not had effective counsel from attorney Borrelli" and asked for "a change of counsel, and a new investigator."

That motion, however, does not demonstrate any changes that affected Audette's understanding of the charges or penalties against him. Nor does the motion suggest that Audette erroneously believed that he was still being represented by Borrelli. Rather, Audette acknowledged in his motion that he was "appear[ing] pro se." Properly construed, Audette's motion requested new standby counsel—relief to which he had no right. *See Mendez-Sanchez*, 563 F.3d at 947. Because Audette's request did not entitle him to a new *Faretta* colloquy, the court did not err by failing to conduct a second *Faretta* hearing.

## II. Competency for Self-Representation

Audette argues that the district court erred under *Indiana v. Edwards* in concluding that he was competent to represent himself. 554 U.S. 164 (2008). "We review the district court's factual finding that [a defendant was] competent to represent [himself] for clear error." *United States v. Johnson*, 610 F.3d 1138, 1145 (9th Cir. 2010).

In *Edwards*, the Court held that a defendant who is competent to stand trial may nonetheless be incompetent to represent himself at trial. *Id.* at 174–78. Animating *Edwards* was a concern that permitting a defendant to represent himself when he lacked the competency to do so would "undercut[] the most basic of the Constitution's

criminal law objectives, providing a fair trial." *Id.* at 176–77. We have interpreted *Edwards* as establishing that "a trial court may insist on representation for a defendant who is competent to stand trial but who is suffering from severe mental illness to the point where he is not competent to perform the more arduous task of representing himself." *Johnson*, 610 F.3d at 1144–45.

For a defendant to fall under the holding of *Edwards*, however, he must be among a narrow class of defendants who "suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." 554 U.S. at 178. The defendant in *Edwards*, for example, suffered from schizophrenia and delusions, was more than once found incompetent to stand trial, and filed several incoherent written pleadings. *Id.* at 167–69.

Audette contends that he too was at first found incompetent to stand trial, exhibited "Other Specified Personality Disorder (Antisocial and Narcissistic Features)" after he was found competent to stand trial, and engaged in bizarre trial behavior—such as telling the court that he wished to tell the jury about "[him] and President Clinton hiding guns and badges in a toilet while eating egg rolls."

We acknowledge that Audette exhibited unusual behavior and nonconventional trial tactics. We hold, however, that he is distinct from the class of defendants discussed in *Edwards*. In the report finding Audette competent to stand trial, he was found to have "demonstrated adequate rational ability to consider potential legal options at trial, accurately articulating the available pleas," and "expressed a thorough understanding of the specifics of his charges." Audette also presented a zealous defense during trial and at sentencing—the district court commented that his "written work" was "even [] better than some of the lawyers

I've had a chance to deal with." Audette's behavior, therefore, distinguishes him from the defendant in *United States v. Ferguson*, who we held was incompetent to represent himself when he "did absolutely nothing" at trial and "submitted three nonsensical motions, did not object to the PSR, and did not make any legal arguments" at sentencing. 560 F.3d 1060, 1069 (9th Cir. 2009).

Audette is more analogous to the defendants in *Johnson*, whose *Edwards* claim we rejected. *Johnson*, 610 F.3d at 1143–47. Like those defendants, Audette "gave [an] opening statement[], testified, examined and cross-examined witnesses, . . . and delivered [a] closing argument[] of significant length." *Id.* at 1146. Audette also understood his right to challenge the jury instructions and waived that right. Throughout the trial, Audette questioned witnesses and presented arguments in support of his defense. That defense failed, but as we held in *Johnson*, Audette "had the right to present [his] unorthodox defenses and argue [his] theories to the bitter end." *Id.* at 1147. The district court did not clearly err by granting Audette the right to represent himself.

## III.   Confrontation Clause

Audette next argues that the district court violated his Sixth Amendment right to confront the witnesses against him by admitting the testimony of Agent Darryl Hill about statements made to him by Audette's wife and stepdaughter. Because those statements contradicted his defense, Audette argues that he should have had the opportunity to cross-examine his wife and stepdaughter. Audette did not object to the admission of Agent Hill's testimony at trial, so we review for plain error. *See United States v. Blandin*, 435 F.3d 1191, 1195 (9th Cir. 2006).

The Confrontation Clause "applies only to testimonial *hearsay*, and 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'" *United States v. Wahchumwah*, 710 F.3d 862, 871 (9th Cir. 2013) (quoting *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004)). The statements of Audette's wife and stepdaughter were testimonial because they were "taken by [a] police officer[] in the course of interrogations," *Crawford*, 541 U.S. at 52, but they do not appear to have been presented for the truth of the matter asserted. Instead, the government offered Agent Hill's testimony to explain why they focused on Audette—rather than the various CIA and FBI agents who allegedly ordered Audette to borrow money from the victims—as a suspect. If introduced for that purpose, Agent Hill's testimony did not violate Audette's Sixth Amendment rights. *See United States v. Johnson*, 875 F.3d 1265, 1279 (9th Cir. 2017) (no violation of the Confrontation Clause when testimony was introduced "to rebut[] [the defendant's] theory of the case").

Even if Agent Hill's testimony was improper, Audette has not shown that it "affect[ed] [his] substantial rights." *Johnson v. United States*, 520 U.S. 461, 466–67 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). Significant evidence introduced at trial—including testimony by Audette's victims and his other family members—supported the statements by Audette's wife and stepdaughter. Audette rebutted those statements, and the court instructed the jury that it could "decide which testimony to believe and which testimony not to believe." Even assuming Agent Hill's testimony was inadmissible, therefore, we find that any error was harmless.

## IV.    Evidence to Support Counts 81–90

Audette argues that the district court erred in denying his motion for judgment of acquittal on Counts 81–90 because insufficient evidence supported his conviction for those counts. The government agrees. Accordingly, we reverse Audette's convictions for those counts and remand to the district court with instructions that it enter a judgment of acquittal on those counts.

## V.  Prosecutorial Misconduct

Audette alleges three instances of prosecutorial misconduct during trial. We again review for plain error because Audette did not object to the alleged misconduct at trial. *See United States v. Reyes*, 660 F.3d 454, 461 (9th Cir. 2011).

First, Audette argues it was misconduct for the government to elicit inadmissible hearsay during its examination of Agent Hill. But that contention fails because, as we explain above, Agent Hill's testimony was not offered for the truth of the matter asserted and thus was not hearsay. Moreover, the questions to Agent Hill were not phrased to elicit improper hearsay evidence. Rather than ask Agent Hill to recount what Audette's wife and stepdaughter said to him, the prosecutor asked if their statements were consistent with Audette's version of events. Such a question does not constitute prosecutorial misconduct. *See United States v. Etsitty*, 130 F.3d 420, 424 (9th Cir. 1997) (per curiam), *as amended*, 140 F.3d 1274 (9th Cir. 1997) (no prosecutorial misconduct where "[n]othing in the questioning or the answers given can be construed to reflect an intention by the prosecutor to mislead the jury").

Second, Audette argues that, in its closing argument, "the [government] misstated the law and mischaracterized Mr. Audette's defense theory by discussing the absence of a jury instruction on the public authority defense." Audette contends that the government's misstatement led the jury to believe that Audette had unsuccessfully asserted a public authority defense, whereas his actual defense was that he lacked the intent to commit the charged offenses. But the court instructed the jury to "consider only the testimony and exhibits received into evidence" in reaching their verdict, and "what the lawyers have said in their . . . closing arguments . . . is not evidence." That instruction sufficiently minimized any prejudice caused by the government's erroneous statement so as to not warrant reversal on the basis of plain error. *See Drayden v. White*, 232 F.3d 704, 713–14 (9th Cir. 2000).

Third, Audette argues that the government improperly appealed to the fears and passions of the jury during its closing argument. Audette challenges the following statement by the government:

> You see, the defendant had 20 years of success with this story repeating it over and over again, and now he is doing the same to you. He's repeating a story in the desperate hopes that you will somewhere deep inside you think that he might be telling the truth . . . . [Audette] got into these victim's head— heads for ten—20 years, where they couldn't get out. Do not let him get into your head. Find this defendant guilty.

Although the government's closing argument may have "appeal[ed] for the jury to act as a conscience of the

community," it did not constitute misconduct because it was not "specifically designed to inflame the jury." *United States v. Lester*, 749 F.2d 1288, 1301 (9th Cir. 1984). The statement above, and the rest of the government's closing argument, reminded the jury of the government's theory of the case: that Audette had committed fraud by fabricating a tall tale to victims for many years. Its closing argument did not "urge jurors to convict [Audette] in order to protect community values, preserve civil order, or deter future lawbreaking"—all of which we have found to be improper. *United States v. Leon-Reyes*, 177 F.3d 816, 822 (9th Cir. 1999). The government's closing argument did not affect Audette's substantial rights, and therefore does not constitute plain error.

## VI.    Failure to Continue the Trial

Audette argues that the district court erred by not granting him a continuance when his son, whom Audette had subpoenaed, did not arrive at court on the day he was supposed to testify. Had he received a continuance, Audette contends, "it is likely that the parties could have reached an agreement as to alternative arrangements (*e.g.*, telephonic or video testimony) for obtaining testimony from [his son]."

We review the district court's failure to grant a continuance for abuse of discretion "even where, as here, no motion for continuance was made." *United States v. Orlando*, 553 F.3d 1235, 1237 (9th Cir. 2009). A court does not abuse its discretion unless the denial of a continuance was "arbitrary or unreasonable." *United States v. Wills*, 88 F.3d 704, 711 (9th Cir. 1996). "[M]ost critical" to that determination is whether Audette was harmed. *United States v. Mejia*, 69 F.3d 309, 316 (9th Cir. 1995).

Audette argues that the lack of a continuance prejudiced him. But the record demonstrates that his son's testimony was a relatively small piece of the evidence Audette offered in support of his defense. Accordingly, Audette fails to show that the court's failure to grant a continuance sua sponte prevented him from presenting a defense.

This case is distinct from *United States v. Pope*, in which we held that the district court abused its discretion by denying the defendant a continuance. 841 F.2d 954, 958 (9th Cir. 1988). There, the lack of a continuance prevented the defendant from introducing "the only testimony that could plausibly have helped him." *Id.*; *see also United States v. 2.61 Acres of Land*, 791 F.2d 666, 671 (9th Cir. 1985) (finding prejudice where denial of continuance prevented defendant from introducing any evidence on its behalf); *Armant v. Marquez*, 772 F.2d 552, 557 (9th Cir. 1985) (finding prejudice where denial of continuance deprived defendant of the opportunity to prepare a defense).

Not so here. Audette himself testified for over four hours. He then subpoenaed three witnesses whom he claimed would support his defense that he borrowed money under orders from federal officials. Two of those witnesses—Audette's sister and his stepdaughter—testified on his behalf. Audette referred to that evidence during his closing argument when making his final case to the jury. The lack of a continuance, therefore, did not prevent Audette from presenting his case to the jury.

We also note that Audette failed to request a continuance despite being given several opportunities to do so. When the district court continued the trial to allow Audette's witnesses to be subpoenaed, it stated that it "want[ed] to make sure [Audette had] everything [he] needs to adequately defend [himself]." The next week, when Audette learned that his

son had not come to the courthouse, neither he nor his standby counsel asked the court to continue the case. After Audette's sister and stepdaughter testified, the court asked Audette to call his next witness. After a thirty-second discussion with Borrelli, Audette told the court that he rested his case.

We acknowledge that the district court could have granted him a continuance sua sponte. "But could is not should," *M. K. ex rel. Barlowe K. v. Prestige Acad. Charter Sch.*, 751 F. App'x 204, 207 (3d Cir. 2018), so we cannot conclude that the court abused its discretion by failing to grant Audette a continuance that he did not ask for. Indeed, the district court exercised its discretion to help Audette present his defense by continuing the trial for four days, and stated that it would give Audette "whatever time [he] need[ed]." When one of Audette's witnesses didn't show, the ball was in his court. Rather than ask for more time, Audette proceeded to call two witnesses and rest his case. Perhaps he no longer thought his son's testimony would help his case. Or maybe he thought his son's testimony was no longer necessary because the government had failed to satisfy its burden of proof. No matter the reason, we conclude that the district court did not abuse its discretion by not continuing Audette's case.

## VII. Cumulative Error

Audette argues that even if the district court's individual errors do not warrant reversal, the cumulative effective of three errors—the admission of statements by Audette's wife and stepdaughter in violation of the Confrontation Clause, prosecutorial misconduct, and the district court's failure to grant a continuance—sufficiently prejudiced Audette to warrant reversal.

We reject that argument because Audette has not demonstrated that the district court committed any error. *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (finding "no reason to reverse for cumulative error" where the district court did not err). Even if the district court's admission of Agent Hill's testimony violated the Confrontation Clause, that harmless error does not support a finding of cumulative error. *See McDonald v. Castro*, 92 F. App'x 447, 451 (9th Cir. 2004) ("Because [the defendant] has proven only a single, harmless error, he cannot demonstrate cumulative error amounting to a constitutional violation.").

## VIII.   Motions for Mistrial

Audette argues that the district court erred in denying what Audette styled "motions for mistrial," which he filed after his conviction, because it applied the wrong legal standard. He contends that the court applied a heightened standard of review by erroneously construing the motions as motions for judgment of acquittal under Federal Rule of Criminal Procedure 29, rather than a more lenient standard of review that would have applied had the court construed the motions as motions for a new trial under Rule 33.

In its order denying Audette's motions, the district court stated that, despite previously being told to do so, Audette failed to "state the grounds on which [his motion] is based and the relief . . . sought." *See* Fed. R. Crim. P. 47(b) ("A motion must state the grounds on which it is based and the relief or order sought."). Audette fails to identify any precedent, and we are aware of none, that requires a court to construe a defendant's post-trial motion as requesting relief that the motion itself does not request. Audette points only to the general principle that "pro se pleadings are construed liberally." A liberal construction, however, does not require the district court to play psychic.

Because Audette filed motions for mistrial, we review for abuse of discretion. *See United States v. Nelson*, 137 F.3d 1094, 1106 (9th Cir. 1998). Audette does not argue that the court abused its discretion in denying his post-trial motions, and we cannot conclude with "a definite and firm conviction that the court below committed a clear error of judgment." *United States v. English*, 92 F.3d 909, 912 (9th Cir. 1996). The district court analyzed each of Audette's contentions for mistrial—that certain witnesses did not testify, that Audette received ineffective assistance of counsel, and bias of the district court judge—and found that they did not warrant a mistrial. Accordingly, we hold that the district court did not err by declining to construe Audette's motions for mistrial as motions for a new trial, and did not abuse its discretion when it denied the motions.

## IX.    Sentencing Errors

We need not address Audette's arguments about his sentence. Having concluded that insufficient evidence supported Audette's convictions for counts 81–90, we remand for resentencing on an open record. *See United States v. Matthews*, 278 F.3d 880, 885 (9th Cir. 2002) (en banc). On remand, the district court is free to consider any matters relevant to sentencing, including those not raised at the first sentencing hearing. *See United States v. Caterino*, 29 F.3d 1390, 1394 (9th Cir. 1994) ("The general rule is that a district court on remand may take any matter into account and may hear any evidence relevant to sentencing."), *overruled on other grounds by Witte v. United States*, 515 U.S. 389 (1995).

## CONCLUSION

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'"

*Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)), which includes "the right to present the defendant's version of the facts," *Washington v. Texas*, 388 U.S. 14, 19 (1967). That Audette used that right to present an unorthodox and ultimately unsuccessful defense does not warrant finding that he could not represent himself. The district court did not err in finding that Audette waived his right to counsel and was competent to represent himself.

We agree with the parties that insufficient evidence supported Audette's convictions for Counts 81–90, but otherwise reject Audette's challenges. Accordingly, we affirm Audette's convictions as to Counts 1–80 and Count 91, reverse as to Counts 81–90, and remand his case for resentencing on an open record.

**CONVICTION AFFIRMED IN PART, REVERSED IN PART, SENTENCE VACATED, and CASE REMANDED for resentencing on an open record.**